UNIROYAL, INC. *v.* CHAMBERS GASKET AND MANUFACTURING
COMPANY; THRUSH PRODUCTS

[No. 2-476A127. Filed September 19, 1978.]

*Eugene J. McGarvey, Jr., Thomas J. Trauring, Fell and McGarvey*, of Kokomo, for appellant.

*George C. Rabens, Rabens, Formusa & Glassman*, of Chicago, Illinois, for appellee Chambers Gasket & Mfg. Co.; *Russell T. Keith, Keith, Berkshire & Keith*, of Peru, for appellee Thrush Products.

SULLIVAN, J.—Thrush Products (Thrush) requested that Chambers Gasket and Manufacturing Company (Chambers) fabricate gaskets for use by Thrush in the manufacture and sale of pressure reducing valves. The material normally used in such fabrication was unavailable. Therefore, Chambers inquired of Uniroyal, Inc. (Uniroyal), a supplier of raw material, whether there existed a reasonable substitute and if so, that Chambers be supplied with a sample. Uniroyal responded that a substitute was indeed available and a sample of such material was submitted, although there is some conflict whether the sample was sent directly to Thrush or routed through Chambers to Thrush. In any event, Thrush, after testing a gasket fabricated from the sample, was satisfied and notified Chambers to begin the fabrication process. Chambers, in turn, mailed a purchase order to Uniroyal, specifying the quantity of material desired, the price therefor, and the date for shipment. Uniroyal replied to the purchase order with an "Order Acknowledgment" which stated:

"WE ACKNOWLEDGE AND THANK YOU FOR YOUR ORDER.

OUR ACCEPTANCE OF THE ORDER IS CONDITIONAL ON THE BUYER'S ACCEPTANCE OF THE CONDITIONS OF SALE PRINTED ON THE REVERSE SIDE HEREOF. IF BUYER DOES NOT ACCEPT THESE CONDITIONS OF SALE, HE SHALL NOTIFY SELLER IN WRITING WITHIN SEVEN (7) DAYS AFTER RECEIPT OF THIS ACKNOWLEDGMENT."

The "Conditions of Sale" on the reverse side provided, in pertinent part:

1. The Seller's products are not guaranteed for any specific length of time or measure of service, but are warranted only to be free from defects in workmanship and material, and all goods shall be subject to seller's normal manufacturing tolerances. There are no warranties, express or implied, of merchantability, fitness, or otherwise which extend beyond those stated in the sentence immediately prior to this one and the name, code, or size, or in their absence, other identifying designation of the goods, exclusive of performance characteristics, contained in the description appearing on Seller's quotation form, or in its absence, on Buyer's Purchase Order form.

Buyer's exclusive remedy for breach of any warranty is limited to a refund of the purchase price of the merchandise, or at the Seller's option, to replacement upon its return. Under no circumstances shall the Seller be responsible for consequential damages.

No claim for any breach of warranty herein shall be considered unless delivered in writing to the Seller within thirty (30) days after date of delivery of the first shipment with respect to which claim is made.

This procedure was employed by the parties each time a new order was placed, followed by shipment and delivery of the goods.

Thrush thereafter determined the gaskets to be defective, and initiated suit against Chambers for breach of express and implied warranties. Chambers filed a Third-Party complaint against Uniroyal, pursuant to Ind. Rules of Procedure, Trial Rule 14, and in addition, "vouched-in" Uniroyal under the provisions of the Uniform Commercial Code,[1] claiming a right of indemnity in the event Chambers was found liable

---

1. IC 26-1-2-607(5)(a) (Burns Code Ed. 1974). Hereinafter, reference to the Uniform Commercial Code as adopted in Indiana will be indicated by citing the chapter and section numbers, e.g., § 2-607(5)(a), which may be found in IC 26-1.

to Thrush. Uniroyal, however, did not accept Chambers' tender of its defense. The trial of the two claims was severed and, after the first trial, Thrush recovered a judgment against Chambers. Thereafter, both Chambers and Uniroyal moved for summary judgment on the indemnity claim, and the trial court granted judgment in Chambers' favor. Uniroyal's appeal from that judgment, now before us, claims sixteen specific errors, most of which are related to the validity of the "Conditions of Sale" which purported to disclaim warranties, establish a time limit for notice of an alleged breach, and limit Uniroyal's liability to a refund of the purchase price. Uniroyal further alleges procedural irregularities as reversible error.

## CONTRACT FORMATION

The case before us presents, in classic manner, the "battle of the forms" — an issue which requires that we determine whether the writings of the parties created a contract and if so, the terms of that contract.

The trial court and the parties seem to concede the applicability of § 2-207,[2] but the arguments and decision below reflect a fundamental

---

2. § 2-207 provides:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

"(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

"(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognize the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this act."

There is no dispute that the parties to this appeal are "merchants" within the meaning of § 2-104.

misunderstanding of the purpose and effect of that statute. Therefore, we briefly discuss the basic principles of common-law contract formation and the Uniform Commercial Code's modification of those rules.

At common-law, "for an offer and an acceptance to constitute a contract, the acceptance must meet and correspond with the offer in every respect, neither falling within nor going beyond the terms proposed, but exactly meeting [those terms] at all points and closing with them just as they stand." *Gates v. Petri* (1957), 127 Ind. App. 670, 143 N.E.2d 293, 297. An acceptance which varies the terms of the offer is considered a rejection and operates as a counter-offer, which may be accepted by the original offeror by performing without objection under the terms contained in the counter-offer.

§ 2-207 was specifically designed to alter the common-law "mirror-image" rule. Nordstrom, *Handbook of the Law of Sales* § 37 (1970). The drafters recognized that in commercial practice, especially with the advent of printed forms, the terms of the "offer" and "acceptance" were seldom the same. They further recognized that the parties to a commercial transaction seldom were aware of the conflicting terms and conditions contained in the printed forms they exchanged. § 2-207 was therefore designed to allow enforcement of an agreement despite discrepancies between offer and acceptance, if enforcement could be required without either party being bound to a material term to which he has not agreed. *American Parts Co., Inc. v. American Arbitration Assoc.* (1967), 8 Mich.App. 156, 154 N.W.2d 5, 12.

In order to give effect to the expectations of the parties, § 2-207 recognizes that ". . . a proposed deal which in commercial understanding has in fact been closed is recognized as a contract." Uniform Commercial Code § 2-207, Official Comment 2. Thus, "[a] definite and seasonable expression of acceptance . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon . . ." § 2-207(1). If a contract is recognized under sub-section (1), the additional terms in the acceptance are treated as proposals for additions to the contract which, as between merchants, become part of the contract unless certain specified conditions render the proposals inoperative. § 2-207(2).

However, if an acceptance is expressly conditioned on the offeror's assent to the new terms, and no assent is forthcoming, the "entire transaction aborts." *Dorton v. Collins & Aikman Corp.* (6th Cir. 1972), 453 F.2d 1161, 1166; *Falcon Tankers, Inc. v. Litton Systems, Inc.* (Del.Super. 1976), 355 A.2d 898, 906. In other words, "...the consequence of a clause conditioning acceptance on assent to the additional or different terms is that as of the writings, there is no contract." Deusenberg & King, *Sales and Bulk Transfers* § 3.06[3][a] (1977). Yet if the parties' conduct recognizes the existence of a contract by performance (see §§ 2-204, 2-206) it is sufficient to establish a contract for sale. In such case, the terms of the contract are those on which the writings of the parties agree, together with supplemental provisions of the Code.[3] § 2-207(3). See also, *Williston on Sales* § 7-5 (4th Ed. 1973).

In the context of this analytic framework, we begin our consideration of the present appeal by examining the findings of the trial court:

"I. The following facts appear from the Motions, Exhibits, Affidavits, Depositions, Memoranda, and Briefs filed herein, and from the evidence adduced at the trial upon the Complaint of Thrush vs. Chambers, to be agreed upon or established without any genuine issue thereon:

A. At all times pertinent Uniroyal has manufactured and sold materials to Chambers which were cut by it and sold and delivered to Thrush.

B. The materials purchased by Chambers from Uniroyal were resold by Chambers to Thrush in the form of the diaphragms which were cut by Chambers.

C. That the materials purchased by Chambers from Uniroyal were for use in the manufacture and assembly of pressure reducing valves by Thrush.

D. That the material was recommended by Uniroyal as being suitable for use by Thrush in the assembly and manufacture of valves for it and for resale to customers of Thrush.

---

3. For example, § 2-308 ("Unless otherwise agreed ..."), § 2-314 ("Unless excluded or modified ..."), § 2-319 ("Unless otherwise agreed ..."), § 2-511 ("Unless otherwise agreed ..."), § 2-513 ("Unless otherwise agreed ..."), as well as numerous other provisions of the Code.

E. That the diaphragms, manufactured out of the materials by Chambers, were thereupon used by Thrush as understood and intended by all the parties.

F. That some of the materials did not conform to the samples originally furnished by Uniroyal and were not of substantially the same kind and quality thereof.

G. That the materials contained latent defects which permitted leakage of water and ineffective use in the valves assembled by Thrush.

H. That damages resulted to both Thrush and Chambers as a result of any [sic] defects in the materials.

I. That Thrush has sustained damage of $4,076.56, the amount paid by it for the gaskets, and resultant or consequential damages in the amount of $11,737.05, a total of $15,813.61 as a direct result of the gaskets being defective, unfit for the use intended, and in varying from samples originally furnished by Uniroyal.

J. That Chambers was legally justified in relying upon Uniroyal to supply it with materials which were not defective, were in conformance with samples, were of merchantable quality, and were subject to reasonable care by Uniroyal in the inspection and testing thereof for purpose of discovering any defects therein.

K. That since Chambers has been found liable to Thrush, in the amount of $15,813.61 plus costs, Uniroyal is liable to Chambers but not in the amount of the damages sustained by Thrush.

L. That Chambers did not make an in-depth or individual testing inspection of the material sold to it by Uniroyal, but did make the usual quality inspection of the gasket diaphragms cut by it and sold and delivered to Thrush.

M. That the Limitation of liability provisions [sic] of the contract between Chambers and Uniroyal is unconscionable, and is not operative under the contract between the parties.[4]

N. That Chambers is and was a merchant with respect to its contracts with Uniroyal for the purchase of the materials.

---

4. The trial court apparently used the phrase "limitation of liability" to denote the provision requiring notice of breach within thirty (30) days of delivery. Compare "Finding T" with "Finding V", infra. "Finding M" is more properly denominated as a Conclusion of Law.

O. That Chambers' offer to purchase from Uniroyal expressly limited acceptance to terms of the offer.

P. That Uniroyal's terms and conditions materially altered the contract.[5]

Q. That some of the materials sold by Uniroyal to Chambers were of a grade and type normally used in the industry for the manufacture of gaskets, and some were not of the same quality.

R. That some of the materials sold by Uniroyal to Chambers met industry standards, and some did not.

S. That some of the materials sold by Uniroyal to Chambers conformed to the merchandise ordered, and some did not.

T. That Uniroyal was not notified by Chambers of an alleged breach of their contract within thirty days after delivery of the goods, but was notified within a reasonable time by Chambers after Chambers was notified by Thrush of the defects appearing in the field in gaskets made from materials furnished to Chambers by Uniroyal.

U. That as suggested by Item 2 on Page 13 of Uniroyal's Motion for Summary Judgment, Uniroyal's liability to Chambers is limited to a refund of the purchase price of the defective merchandise. That since the materials furnished by Uniroyal pursuant to different orders were intermingled by Chambers in the manufacture of the gaskets, thus requiring return of *all* the manufactured gaskets by Thrush to Chambers, that Chambers is entitled to recovery from Uniroyal of only $5,737.70, rather than the full amount of Thrush's judgment against Chambers of $15,813.61.

"II. That the Third Party Complaint filed by Chambers Gasket and Manufacturing Company, Inc., states a claim upon which relief can be granted."[6]

These findings of fact contain inconsistencies which cannot be reconciled. Chambers' offer to purchase was found to have expressly limited acceptance to the terms of that offer. Yet Chambers' purchase order contains nothing to so indicate. Indeed, a thorough review of the record reveals no factual foundation for such a determination.

---

5. This "finding" may be a conclusion of law or it may be a member of that mysterious and elusive species—the mixed finding of fact and conclusion of law.

6. This would clearly appear to be the trial court's "conclusion of law."

The trial court also found that Uniroyal's disclaimer of warranties in its "Conditions of Sale" was inoperative because it was an additional term which "materially altered" the contract. The provision requiring notice of a claim for breach of contract within thirty (30) days from delivery was held "unconscionable." Finally, the trial court inexplicably found Uniroyal's contractual limitation of liability provision valid and operative. See footnote 4, *supra*.

We first note that if, in fact, Chambers' offer had expressly limited acceptance to the terms of the offer, Uniroyal's "Conditions of Sale" would not be incorporated as terms of the contract, *Tunis Mfg. Corp. v. Allen Knitting Mills* (1976), 87 Misc.2d 1091, 386 N.Y.S.2d 911, for the Code continues to allow an offeror to be the "master of his offer." § 2-207(2)(a). See Deusenberg & King, *supra*, § 3.06[2]. Thus, Uniroyal's disclaimer of warranties and limitation of notice for breach would be ineffective, as would its provision limiting liability.

However, as previously noted, there is no factual basis in the record to support a finding that Chambers' offer expressly limited acceptance to the terms of the offer. Chambers' purchase order contained only terms of price, quantity and shipment date. On the other hand, Uniroyal's "acceptance" contained an "Order Acknowledgment" which we think important to restate here:

> "WE ACKNOWLEDGE AND THANK YOU FOR YOUR ORDER. OUR ACCEPTANCE OF THE ORDER IS CONDITIONAL ON THE BUYER'S ACCEPTANCE OF THE CONDITIONS OF SALE PRINTED ON THE REVERSE SIDE HEREOF. IF BUYER DOES NOT ACCEPT THESE CONDITIONS OF SALE, HE SHALL NOTIFY SELLER IN WRITING WITHIN SEVEN (7) DAYS AFTER RECEIPT OF THIS ACKNOWLEDGMENT."

Uniroyal's "acceptance" was expressly conditional on Chambers' assent to the terms contained in the "Conditions of Sale." A few cases exist which would seem to require the conclusion, in such circumstance, that Uniroyal's "acceptance" was in fact a "counter-offer" which Chambers accepted by taking delivery of goods and failing to object to the new terms. *Roto-Lith, Ltd. v. F. P. Bartlett & Co.* (1st Cir. 1962), 297 F.2d 497. See also *Gilbert & Bennett Mfg. Co. v. Westinghouse Elec-*

*tric Corp.* (D. Mass. 1977), 445 F. Supp. 537; *Beech Aircraft Corp. v. Flexible Tubing Corp.* (D. Conn. 1967), 270 F. Supp. 548.

*Roto-Lith, supra,* involved a purported acceptance of an offer which disclaimed all warranties, express and implied. The court held that where an acceptance states a condition materially altering the obligations "solely to the disadvantage of the offeror" it is, in effect, an acceptance expressly conditional on assent to the additional terms and therefore a counteroffer. Thus, when the offeror accepted the goods without objection, it became bound to the terms of the offeree's responsive document.

The *Roto-Lith* reasoning has not been well-received. Indeed, the weight of authority uncovered by our research rejects the *Roto-Lith* approach[7] because it permits a result that § 2-207 was designed to avert, i.e., it revives the "last-shot" technique available to an offeree under the common-law mirror-image rule. Deusenberg & King, *supra,* §§ 3.04[1], 3.06[3]. Thus, acceptance of the *Roto-Lith* rationale would subvert the very purpose of § 2-207 by binding an offeror to the terms contained in his offeree's "counter-offer" when the offeror takes delivery of the goods and performs his part of the bargain. Nor would the purpose of § 2-207 be well-served by allowing an offeree's responsive document to state additional or different terms, and provide that the terms will be deemed accepted by the offeror's inaction. To permit this

> ". . . seems inconsistent with the objective of Section 2-207, and would allow the offeree . . . almost unilaterally to re-instate the common-law rationale, for the hypothesis of Section 2-207 that businessmen do not read exchanged printed forms assumes that the offeror-buyer would not learn of the term. Furthermore, the clause placing the burden of affirmative objection on the original offeror is itself a modification of the offer to which the offeror should first have to assent, and absent its assent, any shipping and accept-

---

7.  *C. Itoh & Co. (America) Inc. v. Jordan International Co.* (7th Cir. 1977), 552 F.2d 1228; *Dorton v. Collins & Aikman Corp., supra; Ebasco Services Inc. v. Pennsylvania Power & Light Co.* (E.D. Pa. 1975), 402 F.Supp. 421; *Rite Fabrics, Inc. v. Stafford-Higgins Co., Inc.* (S.D.N.Y. 1973), 366 F.Supp. 1; *Steiner v. Mobil Oil Corp.* (1977), 20 Cal. 3d 90, 141 Cal. Rptr. 157, 569 P.2d 751. See also *Construction Aggregates Corp. v. Hewitt-Robins, Inc.* (7th Cir. 1968), 404 F.2d 505, cert. den. 395 U.S. 921 (1969); *Southern Idaho Pipe & Steel Co. v. Cal-Cut Pipe & Supply, Inc.* (1977), 98 Idaho 495, 567 P.2d 1246.

ance of the goods should be deemed to constitute the consummation of the contract under [Section 2-207](3)." Deusenberg & King, *supra*, § 3.06[4].

Therefore, we add Indiana to the growing list of jurisdictions which reject *Roto-Lith* and we choose a construction of the statute which effectuates its announced policies.

In the case before us, the writings exchanged between Chambers and Uniroyal did not create a contract. Uniroyal's acceptance was expressly conditioned on Chambers' assent to the new terms and the record reveals no manifestation of Chambers' assent to those terms. However, both parties performed what they apparently believed to be their contractual obligations, as evidenced by the shipping and acceptance of the goods. Therefore, their conduct is "sufficient to establish a contract." § 2-207(3). *Cf.* §§ 2-204, 2-206.

The terms of the contract are those on which the writings agree, as supplemented by applicable Code provisions. The writings between Chambers and Uniroyal agree only as to terms of price, quantity and time for shipment. All other terms contained in the writings are therefore inoperative and the Code must supply any additional terms.

We here identify only one relevant provision of the Code which supplements the agreement: § 2-314, which imposes an implied warranty of merchantability.

### ALLEGED PROCEDURAL IRREGULARITIES

The record of the pre-trial conference reveals that counsel and the trial court were much concerned with the method of deciding both claims simultaneously.[8] Thrush and Chambers desired a bench trial of their case, while Uniroyal demanded a jury trial of the indemnity claim. Other difficulties concerning the method of trial were discussed and, at the suggestion of Uniroyal's counsel, all problems were resolved in favor of a severance of the two claims with trial to be conducted on successive

---

8. This concern stemmed from an attempt to effectuate the purpose underlying TR. 14: "to permit common questions of fact to be determined in one litigation in order to avoid delay between a judgment against a party in one action and a judgment for him in a separate action, and to militate against inconsistent results." *City of Elkhart v. Middleton* (1976), 265 Ind. 514, 356 N.E.2d 207, 211. See also Wright & Miller, *Federal Practice and Procedure: Civil* § 1442 (1971).

days.[9] An order book entry dated April 1, 1973 was entered, stating that the action was taken by agreement of the parties.[10]

Three days before the first trial was scheduled to commence, Thrush and Chambers appeared and submitted their case for trial by court, resulting in judgment for Thrush. Uniroyal was not notified of these proceedings. Thereafter, both Chambers and Uniroyal sought summary judgment with respect to the severed and independent indemnity claim. Before granting Chambers' motion, the trial court considered the evidence adduced at the trial of Thrush v. Chambers and apparently concluded that Uniroyal was bound as to questions of fact common to the two litigations. Uniroyal's appeal attacks the grant of summary judgment as well as the preclusive effect of the judgment entered as a result of the trial of Thrush v. Chambers.

Uniroyal contends that the issues of fact determined in the trial of Thrush v. Chambers are not binding upon it and that it must be given an opportunity to litigate the alleged common factual questions. Uniroyal's position may be briefly summarized as follows:

(1)  it was a "party" to the main claim and, therefore, binding it to determinations of fact therein without notice and an opportunity to be heard denies it due process of law;

(2)  even if not a party to the suit, it is not bound to already resolved common fact questions pursuant to "voucher" because employment of the impleader device precludes concomitant use of the voucher procedure; and

---

9.  Neither party has attached significance to the distinction between "severance" and "separation," see *Lusk v. Pennzoil United, Inc.* (N.D. Miss. 1972) 56 F.R.D. 645, 646, and indeed, the distinction "is often obscured in practice since at times the courts talk of a 'separate trial' and 'severance' interchangeably." Wright & Miller, *supra*, § 2387. Separate trials will usually result in one judgment, but severed claims become entirely independent actions to be tried, and judgment entered thereon, independently. Id. We see no need to further elaborate on the consequences of the distinction, for to do so would obfuscate the issue before us. We note that though the trial court ordered a "separation" of the claims, the transcript of the pre-trial conference clearly reveals that the parties and the trial court contemplated two distinct lawsuits with independent judgments, i.e., a severance.

10.  The record thus belies Uniroyal's contention that the claims were not severed until immediately before the trial of Thrush v. Chambers.

(3)   even if bound to determinations of fact in the first litigation, there exist genuine issues of material fact which preclude summary judgment.

To place our determination of these issues in perspective, it is necessary that we first discuss the process of "voucher to warranty" and the consequences of the vouchee's failure to assume the voucher's defense.

The common-law right of a defendant to "vouch-in" a person liable over to him was set forth in the leading case of *Littleton v. Richardson* (1856), 34 N.H. 179, 66 Am.Dec. 759, 760:

"[W]hen a person is responsible over to another, either by operation of law or by express contract . . . and he is duly notified of the pendency of the suit, and requested to take upon him the defense of it, he is no longer regarded as a stranger, because he has the right to appear and defend the action, and has the same means and advantages of contravening the claim as if he was the real and nominal party upon the record. In every such case, if due notice is given to such person, the judgment, if obtained without fraud or collusion . . . will be conclusive against him, whether he has appeared or not . . . ."

"Voucher to warranty" has deep roots in common-law emanating from England.[11] Its application in America has flourished. In 1963, our General Assembly saw fit to codify the practice as it relates to the law of sales concerning "middlemen" by enacting § 2-607:

"(5) Where the buyer is sued for breach of a warranty or other obligation for which his seller is answerable over (a) he may give his seller notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he will be bound in any action against him by his buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend he is so bound."

Vouching-in is a "simple and expedient way for defendants who have a right over against another to avoid the necessity of relitigating the

---

11.   See Comment, 29 Ark.L.Rev. 486 (1976).

issues of liability to the plaintiff in the first suit." 1B *Moore's Federal Practice* ¶ 0.405[9]. It has the unique advantage of not requiring personal service of process. *Id.*

However, voucher does not alleviate the necessity of a second lawsuit. It merely binds the vouchee to "any determination of fact common to the two litigations." Thus, it was Chambers' burden to establish: (1) that Chambers purchased the goods from Uniroyal; (2) that Chambers sold the goods to Thrush subject to the same warranties received from Uniroyal in the original purchase; (3) that Chambers breached its warranty to Thrush; (4) that the breach resulted in damage to Thrush; (5) that Thrush was able to obtain a judgment against Chambers; (6) that Chambers properly vouched in Uniroyal to assume their defense; (7) that Uniroyal declined to assume the defense; (8) that Chambers has paid the judgment and costs and (9) that at no time was there a change in characteristics or condition of the goods. *Liberty Mutual Ins. Co. v. J.R. Clark* (1953), 239 Minn. 511, 59 N.W.2d 899. See Annot., 73 A.L.R.2d 504 (1960).

The possible defenses that Uniroyal might have presented, as against Chambers on the indemnity claim, include (1) that Chambers did not purchase the goods from Uniroyal; (2) that the sale of the goods to Chambers carried no warranties; (3) that no notice of alleged liability over was received; (4) that Chambers in fact suffered no loss; or (5) that Chambers changed the condition of the goods. *Frank R. Jelleff v. Pollack Bros., Inc.* (N.D. Ind. 1957) 171 F. Supp. 467, 471. See also Squillante, "The Vouching In Letter," 78 Commercial L.J. 415 (1973).

A.

*UNIROYAL WAS NOT DENIED DUE PROCESS OF LAW*

The severance of the claims resulted in two distinct lawsuits. Uniroyal does not cite authority for the proposition that it remained a "party," nor does it otherwise indicate the basis of its argument. There is nothing of record which indicates a false belief by the trial court that Uniroyal remained a "party" to the action between Thrush and Chambers nor has Uniroyal claimed that it (Uniroyal) was misled into so thinking.

When the trial court severed the claims, Uniroyal was no longer a

party to the main claim and thus was not entitled to notice and an opportunity to be heard with respect to the issues embraced in that claim. Therefore, Uniroyal was not denied due process of law.

## B.

### IMPLEADER DOES NOT PRECLUDE THE USE OF VOUCHER

Uniroyal asserts that use of the impleader device precludes Chambers' effort to vouch it into the case. Again, we are without benefit of citation to authority from either party, though Uniroyal does state that no relevant cases could be found. However, both courts and commentators agree that impleader was intended to supplement, not supplant, the older device of voucher.[12] Uniroyal's argument rests upon a supposition that there is a "conflict of interest" created by simultaneous imposition of the two devices.[13]

We decide only issues necessary to determination of the appeal before us. Thus, we decline to engage in a broad and far-ranging discussion of the potential problems which might arise from concurrent use of the impleader-vouching-in devices. Rather we focus upon the facts of the case before us to measure the legitimacy of Uniroyal's argument.

---

12. "Rule 14 will not affect the right of a defendant to vouch in third parties liable to him upon the claim in litigation . . ." Indiana Civil Study Commission Comments. See *West Indian Co. v. S.S. Empress of Canada* (S.D.N.Y. 1967), 277 F. Supp. 1; *Dixon v. Fiat-Roosevelt Motors, Inc.* (1973), 8 Wash.App. 689, 509 P.2d 86; *Moyses v. Spartan Asphalt Paving Co.* (1970), 383 Mich. 314, 174 N.W.2d 797; *Clarke v. Fidelity and Casualty Co. of N.Y.* (1967), 55 Misc.2d 327, 285 N.Y.S.2d 503; *State v. Wood* (1961), 53 Del. 527, 173 A.2d 327; *U.S. Wire & Cable Corp. v. Ascher Corp.* (1961), 34 N.J. 121, 167 A.2d 633. See also 1B *Moore's Federal Practice* ¶ 0.405[9]; 3 *Moore's Federal Practice* ¶ 14.02[1]; 2 Anderson's *Uniform Commercial Code* § 2-607:54 (1971); Cohen, "Impleader: Enforcement of Defendants' Rights against Third Parties," 33 Col.L.Rev. 1147, 1150 (1933).

13. Uniroyal's brief asks "How could Uniroyal as a 'vouched-in' defendant to the original action argue that Chamber[s] has no liability when Uniroyal takes the opinion [sic] that there may have been liability which was not Uniroyal's fault?" Quite simply, Uniroyal's assumption of Chambers' defense would have afforded an opportunity to fully litigate the warranty relationship between Thrush and Chambers, whether a defect existed and the nature and extent of any damages. "Change in condition" of the goods is an issue that could not be raised in the trial of Thrush v. Chambers, for it would not be relevant. However, it is necessarily a key issue in any suit for indemnification between Chambers and Uniroyal.

We also note that Uniroyal did not object to being impleaded and vouched-in nor did it attempt to vacate the use of one or the other as a procedural device. The first time this argument appears is in Uniroyal's Motion to Correct Errors.

Here, the trial court severed the claims and Uniroyal ceased to be a party to the principal claim. The severance placed Uniroyal in the same position as if no third-party complaint had been filed. It was a "vouchee" which had been tendered Chambers' defense. Any issue or defense which Uniroyal desired to raise against Thrush could have been litigated had Uniroyal assumed Chambers' defense. Uniroyal, however, as a factual matter declined to do so and cannot now complain that it was denied an opportunity to participate.

That Uniroyal was not notified of the time for trial of Thrush v. Chambers does not dictate a different result. Uniroyal has refused Chambers' tender of its defense. The record contains no indication that had Uniroyal been notified, it would have changed its position. Given that the assumption of Chambers' defense had been declined, we fail to perceive how the time for trial could have mattered to Uniroyal. Thus we determine as a matter of law that lack of notice did not prejudice Uniroyal and cannot be considered error.

## C.

### *THERE EXISTS A GENUINE ISSUE OF MATERIAL FACT*

From what we have stated heretofore, it necessarily follows that Uniroyal was properly vouched in and therefore is bound to those determinations of fact which are "common to the two litigations." We must therefore isolate the common issues of fact in order to determine the preclusive effect, if any, of the judgment entered following the trial of Thrush v. Chambers.

Only in unusual cases will there be more than two issues "common to the two litigations," i.e., whether the goods were defective at the time of re-sale by the middleman and whether the middleman was liable to the person harmed by the defect. Degnan and Barton, "Vouching to Quality Warranty: Case Law and Commercial Code," 51 Cal.L.Rev. 471, 484 (1963); *Williston on Sales* § 22-10(f) (4th Ed. 1973). Thus, pursuant to § 2-607(5)(a) Uniroyal is precluded from denying the existence of a defect at the time of the sale from Chambers to Thrush. Further, Uniroyal may not raise the defense that the defects were within tolerances. That issue should have been litigated in the trial of Thrush v. Chambers. Uniroyal, by virtue of the voucher statute, cannot now assert this defense.

However, that a defect existed and that Chambers was found liable to Thrush does not, without more, entitle Chambers to summary judgment against Uniroyal. Indeed, from the record before us, we discern at least one issue of fact, not addressed by the trial court's findings, which makes summary judgment inappropriate. There remains for determination the issue whether the goods were delivered to Thrush in the same condition as when Uniroyal sold them to Chambers. *Grummons v. Zollinger* (N.D. Ind. 1960), 189 F. Supp. 64, 66, *vacated on other grounds*, 240 F. Supp. 63 (N.D. Ind. 1964), aff'd 341 F.2d 464 (7th Cir. 1965). *Accord, Smith Radio Communications, Inc. v. Challenger Equipment, Ltd.* (1974), 270 Or. 322, 527 P.2d 711; *Morse Chain Co. v. Formsprag Co.* (1968), 380 Mich. 475, 157 N.W.2d 244. See also Note, 18 Stan.L.Rev. 666 (1966); *Williston on Sales* § 22-10(f) (4th Ed. 1973). Therefore, it was error for the trial court to enter summary judgment.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

White, J., concurs.[14]

Buchanan, C.J., concurs with separate opinion.

## CONCURRING OPINION

BUCHANAN, C.J. — I concur in the result reached by the majority.[1] Unlike them I would be more comfortable exploring further the conduct of the parties to determine if a contract has been freely entered into before resorting to the UCC § 2-207(3). In a word, it is preferable not to narrow the area of freedom of contract.

---

14. Judge White participated in the decision and voted his concurrence in this opinion prior to his resignation from the bench effective June 30, 1978.

1. *Roto-Lith* is distinguishable on its facts. There the order acknowledgment appeared to be an unconditional acceptance of the buyer's offer when in fact the acceptance had incorporated a disclaimer of all warranties, express and implied. The court characterized the response as an acceptance expressly conditional on assent. In the present case, the acceptance, *by its very terms*, was conditioned on Chambers' assent to the additional terms.

Uniroyal's order acknowledgment contained language expressly conditioning acceptance on Chambers' assent to the additional terms contained in the "Conditions of Sale". Based on this finding, the majority holds that the writings of the parties did not create a contract and, consequently, their transaction is governed by UCC § 2-207(3).

To me the inquiry should not stop there. I see Uniroyal's order acknowledgment as a counteroffer extended to Chambers, *see C. Itoh & Co. v. Jordan International Co.* (7th Cir. 1977), 552 F.2d 1228; *Construction Aggregates Corp. v. Hewitt-Robbins, Inc.* (7th Cir. 1968), 404 F.2d 505, *cert. denied*, 395 U.S. 921, thereby necessitating an examination of Chambers' assent in order to determine if an express contract came into being between the parties. Unfortunately that assent was based on Chambers' inaction (silence) which has not been recognized as a mode of acceptance in this kind of a context.[2] *See* 1 W. HAWKLAND, A TRANSACTIONAL GUIDE TO THE UNIFORM COMMERCIAL CODE § 1.090303 at 19-20 (1964).

So no contract was created by the writings of the parties and UCC § 2-207(3) must be applied. My method of arriving there works less of a restraint on freedom of contract—an approach sanctioned in 3 R. DUESENBERG & L. KING, UNIFORM COMMERCIAL CODE SERVICE (MB) § 3.06[3] (1977):

> [I]t must be recognized that the offeree should not be compelled to accept the terms of the offer if he does not want them, and he ought also to be free to respond with a counteroffer.

NOTE—Reported at 380 N.E.2d 571.

---

2. Also, acceptance by inaction is contrary to the objective of § 2-207, which is to eradicate the last-shot technique available to an offeree under the common law mirror-image rule. *See Dorton v. Collins & Aikman Corp.* (6th Cir. 1972), 453 F.2d 1161. *See also* 3 UNIFORM COMMERCIAL CODE SERVICE (MB) 3.06[4] 1977.

If, however, Chambers had merely objected properly to one of the additional terms proposed by Uniroyal this may have provided the required manifestation of assent necessary to bind Chambers to the remaining additional terms. *See Construction Aggregates Corp. v. Hewitt-Robbins, Inc.* (7th Cir. 1968), 404 F.2d 505, *cert. denied*, 395 U.S. 921 (1969).