**BELDEN INC., and, Belden Wire & Cable Company, Appellants–Defendants,**

v.

**AMERICAN ELECTRONIC COMPONENTS, INC., Appellee–Plaintiff.**

**No. 89A01–0709–CV–447.**

Court of Appeals of Indiana.

May 9, 2008.

Rehearing Denied July 11, 2008.

G. Daniel Kelley, Jr., Edward P. Steegmann, Ice Miller, LLP, Indianapolis, IN, Attorneys for Appellants.

Mark A. Whitt, Jones Day, Columbus, OH, Kirk A. Weikart, Gardner Sayre & Weikart, Richmond, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Belden, Inc., and Belden Wire & Cable Company (collectively "Belden") appeal the trial court's granting of partial summary judgment in favor of American Electronic Components, Inc. ("AEC"). We affirm.

### Issues

Belden raises four issues, which we consolidate and restate as:

I. whether the limitation on damages on the back of Belden's order acknowledgment applies to the parties' contract; and

II. whether Belden created an express warranty based on its prior assertions to AEC.

### Facts[1]

Belden manufactures wire, and AEC manufactures automobile sensors. Since

---

1. Indiana Appellate Rule 50(A)(f) requires an appendix to contain "pleadings or other documents from the Clerk's Record in chronological order that are necessary for the resolution of the issues raised on appeal[.]" Neither party includes in its appendix the complaint, the summary judgment motions, the responses or replies, or the designation of evidence in support of summary judgment. However, because neither party raises this issue or chal-

1989, AEC, in repeated transactions, has purchased wire from Belden to use in its sensors.

In 1996 and 1997, Belden sought to comply with AEC's quality control program and provided detailed information to AEC regarding the materials it used to manufacture its wire. In its assurances, Belden indicated that it would use insulation from Quantum Chemical Corp. ("Quantum"). In June 2003, however, Belden began using insulation supplied by Dow Chemical Company ("Dow"). The Dow insulation had different physical properties than the insulation provided by Quantum.

In October 2003, Belden sold AEC wire manufactured with the Dow insulation. AEC used this wire to make its sensors, and the insulation ultimately cracked. Chrysler had installed AEC's sensors containing the faulty wire in approximately 18,000 vehicles. Chrysler recalled 14,000 vehicles and repaired the remaining 4,000 prior to sale. Pursuant to an agreement with Chrysler, AEC is required to reimburse Chrysler for expenses associated with the recall.

In 2004, AEC filed a complaint against Belden seeking consequential damages for the changes in the insulation that resulted in the recall. In 2005, AEC filed a partial motion for summary judgment. In 2006, Belden responded and filed a cross-motion for summary judgment. The motions for summary judgment were "limited to the issues of duty and limitation of remedy and [did] not present any issues as to breach, causation, or damages." Appellant's App. p. 14. On July 6, 2006, the trial court held a hearing on the parties' motions for partial summary judgment. On July 6, 2007, the trial court entered an order granting AEC's motion for partial

summary judgment and denying Belden's cross-motion. Belden now appeals.

### Analysis

In reviewing a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court. *Keaton & Keaton v. Keaton,* 842 N.E.2d 816, 819 (Ind.2006). We decide whether there are genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Id.* Our review is limited to those materials designated to the trial court. *Sees v. Bank One, Indiana, N.A.,* 839 N.E.2d 154, 160 (Ind. 2005) (citing Ind. Trial Rule 56(H)). We accept as true those facts alleged by the non-moving party, construe the evidence in favor of the non-moving party, and resolve all doubts against the moving party. *Id.* When considering cross-motions for summary judgment, the trial court is required to consider each motion separately, construing the facts most favorably to the non-moving party in each instance. *Id.* "We will affirm a grant of summary judgment if it can be sustained on any theory or basis in the record." *Cincinnati Ins. Co. v. American Alternative Ins. Corp.,* 866 N.E.2d 326, 329 (Ind.Ct.App.2007), *trans. denied.*

### I. Battle of the Forms

■ Belden first argues that the boilerplate language on the back of its "customer order acknowledgement" limited the damages available to AEC. Appellant's App. p. 94. The parties were involved in repeated transactions over many years. Prior to 1998, AEC sent all purchase orders by mail on a form that contained AEC's terms and conditions on the back. Beginning in 1998, AEC sent its purchase orders to Belden via fax. The faxed pur-

lenges the evidence included in the other's appendix, we will assume the evidence pro-

vided to us was properly designated.

chase orders only included the front of the form and omitted the terms and conditions printed on the back of the form.

On October 17, 2003, AEC sent Belden a purchase order containing the quantity, price, shipment date, and product specifications. Belden responded on October 22, 2003, with its order acknowledgement. The order acknowledgment referenced AEC's specific requests and contained boilerplate language on the back. At issue here is the language purporting to limit Belden's liability for special, indirect, incidental, or consequential damages. *See id.* at 95. The back of order acknowledgment also stated:

> 1.2 Where this Agreement is found to be an acknowledgment, if such acknowledgment constitutes an acceptance of an offer such acceptance is expressly made conditional upon Buyer's assent solely to the terms of such acknowledgment, and acceptance of any part of Product(s) delivered by Company shall be deemed to constitute such assent by Buyer....

*Id.* Based on these exchanges, the parties dispute whether the limitation on damages is a term of their agreement.[2]

We start our analysis with Section 2–207 of the Uniform Commercial Code ("UCC"),[3] which provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>> (a) the offer expressly limits acceptance to the terms of the offer;
>>
>> (b) they materially alter it; or
>>
>> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

The parties disagree as to whether Section 2–207(2) or Section 2–207(3) applies. In *Uniroyal, Inc., v. Chambers Gasket and Manufacturing Co.,* 177 Ind.App. 508, 380 N.E.2d 571 (1978), we addressed a strikingly similar issue. In that case, Chambers mailed a purchase order for gaskets to Uniroyal, specifying the quantity, price, and date for shipment. Uniroyal responded with and "Order Acknowledgment"

---

**2.** The parties briefly mention that Belden's terms and conditions included a limited warranty provision. However, neither party develops specific arguments regarding this term and the application of Section 2–207. In the absence of a specific argument, this issue is waived. *See* Ind. Appellate Rule 46(A)(8) ("The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning.").

**3.** We use the UCC citations. The Indiana Code citations of the UCC can be found at Indiana Code Article 26–1. *See Continental Grain Co. v. Followell,* 475 N.E.2d 318, 320 (Ind.Ct.App.1985), *trans. denied; see also* Ind. Code § 26–1–2–101 ("IC 26–1–2 shall be known and may be cited as Uniform Commercial Code—Sales.").

stating in part, "Our Acceptance of the order is conditional on the Buyer's acceptance of the conditions of sale printed on the reverse side hereof. If buyer does not accept these conditions of sale, he shall notify seller in writing within seven (7) days after receipt of this acknowledgment." *Uniroyal,* 177 Ind.App. at 508, 380 N.E.2d at 573. Included in the conditions of sale was a limitation on damages. The gaskets were later determined to be defective, Chambers sought indemnification from Uniroyal, and the trial court entered summary judgment in favor of Chambers.

On appeal, we discussed the common law rules of contract formation and the UCC's modification of those rules:

> At common-law, for an offer and an acceptance to constitute a contract, the acceptance must meet and correspond with the offer in every respect, neither falling within nor going beyond the terms proposed, but exactly meeting (those terms) at all points and closing with them just as they stand. An acceptance which varies the terms of the offer is considered a rejection and operates as a counter-offer, which may be accepted by the original offeror by performing without objection under the terms contained in the counter-offer.
>
> § 2–207 was specifically designed to alter the common-law "mirror-image" rule. The drafters recognized that in commercial practice, especially with the advent of printed forms, the terms of the "offer" and "acceptance" were seldom the same. They further recognized that the parties to a commercial transaction seldom were aware of the conflicting terms and conditions contained in the printed forms they exchanged. § 2–207 was therefore designed to allow enforcement of an agreement despite discrepancies between offer and acceptance, if enforcement could be required

without either party being bound to a material term to which he has not agreed.

*Id.* at 512, 380 N.E.2d at 575 (quotations and citations omitted).

Pursuant to Section 2–207, if a contract is formed under Section 2–207(1), the additional terms in the acceptance are considered proposals and become part of the contract unless Section 2–207(2) renders the proposed terms inoperative. "However, if an acceptance is expressly conditioned on the offeror's assent to the new terms, and no assent is forthcoming, the 'entire transaction aborts.' " *Id.* at 513, 380 N.E.2d at 575 (quoting *Dorton v. Collins & Aikman Corp.,* 453 F.2d 1161, 1166 (6th Cir.1972)). In other words, if an acceptance contains a clause conditioning the acceptance on assent to the additional or different terms, the writings do not form a contract. *Id.,* 380 N.E.2d at 575. "Yet if the parties' conduct recognizes the existence of a contract by performance it is sufficient to establish a contract for sale." *Id.,* 380 N.E.2d at 575. The terms of such a contract are those on which the writings of the parties agree, "together with any supplementary terms incorporated under any other provisions of this act." § 2–207(3); *see also Uniroyal,* 177 Ind.App. at 513, 380 N.E.2d at 575.

We applied this framework in *Uniroyal* and rejected a line of cases suggesting Uniroyal's order acknowledgement was a counter-offer that Chambers accepted by taking the delivery of the goods and failing to object to the new terms. *Uniroyal,* 177 Ind.App. at 516–18, 380 N.E.2d at 577–78. We reasoned that such an application revives the "last-shot" doctrine under the common law "mirror-image" rule, the very rule that Section 2–207 was intended to avoid, by binding the offeror to additional terms upon the mere acceptance of goods. *Id.* at 517, 380 N.E.2d at 578. Further, we

observed that the purpose of Section 2–207 would not be well-served by allowing an offeree's responsive document to state additional or different terms, and provide that the terms will be deemed accepted by the offeror's inaction, because Section 2–207 presumes that business people do not read exchanged preprinted forms and assumes that the offeror would not learn of such terms. *Id.,* 380 N.E.2d at 578. We also reasoned:

> the clause placing the burden of affirmative objection on the original offeror is itself a modification of the offer to which the offeror should first have to assent, and absent its assent, any shipping and acceptance of the goods should be deemed to constitute the consummation of the contract under (Section 2–207)(3).

*Id.* 517–18, 380 N.E.2d at 578 (quotation and citation omitted).

We concluded that the writings exchanged by Chambers and Uniroyal did not create a contract but that the parties performed their contractual obligations so as to create a contract under Section 2–207(3). Id. at 518, 380 N.E.2d at 578; *see also Continental Grain Co., v. Followell,* 475 N.E.2d 318, 324 (Ind.Ct.App.1985), *trans. denied,* (applying Section 2–207 and *Uniroyal* to conclude that no contract was formed by the parties' writings or actions). Therefore, the terms of the contract consisted of the terms upon which the parties' writings agreed and the supplementary terms of the UCC. *Uniroyal,* 177 Ind.App. at 518, 380 N.E.2d at 578; *see also* § 2–207(3).

As in *Uniroyal,* we agree here that Belden could not unilaterally include terms that were expressly conditional on AEC's assent. Thus, the parties' writings did not create a contract. Nevertheless, we conclude that the parties' actions were in recognition of the existence of a contract and were sufficient to establish a contract for the sale of wire. The terms of the contract are the written terms on which the parties agreed and the "supplementary terms incorporated under any other provisions of [the UCC]." § 2–207(3).

■ The parties dispute, however, what supplementary terms are incorporated into their contract. The first question we must address is Belden's argument that the terms called for in Section 2–207(2) are included in the parties contract based on Comment 6, which provides:

> If no answer is received within a reasonable time after additional terms are proposed, it is both fair and commercially sound to assume that their inclusion has been assented to. Where clauses on confirming forms sent by both parties conflict each party must be assumed to object to a clause of the other conflicting with one on the confirmation sent by himself. As a result the requirement that there be notice of objection which is found in subsection (2) is satisfied and the conflicting terms do not become a part of the contract. *The contract then consists of the terms originally expressly agreed to, terms on which the confirmations agree, and terms supplied by this Act, including subsection (2).* The written confirmation is also subject to Section 2–201. Under that section a failure to respond permits enforcement of a prior oral agreement; under this section a failure to respond permits additional terms to become part of the agreement.

§ 2–207 cmt. 6 (emphasis added).

Belden urges that, based on the emphasized language, we look to Section 2–207(2) to determine whether the terms in the order acknowledgement are included in the contract. Pursuant to Section 2–207(2), Belden contends that its additional terms became part of the contract unless

they materially altered the contract—the only exclusionary provision of Section 2–207(2) that is relevant under these facts. Belden claims that the limitation on damages does not materially alter the contract.[4]

We need not determine whether the limitation on damages is a material alteration because we believe that Belden's reading of Comment 6 is overbroad. As the Supreme Judicial Court of Massachusetts has observed, Comment 6 only applies where the terms conflict. *Commerce & Industry Ins. Co. v. Bayer Corp.*, 433 Mass. 388, 742 N.E.2d 567, 573 (2001). Because only Belden's order acknowledgment contained a limitation on damages, there are no conflicting terms to implicate Comment 6. *See id.* Further:

> the criteria in [§ 2–207(2)] determine what "additional or different terms" will or will not be part of a contract that is formed by the exchange of writings. Where the writings do not form a contract, [§ 2–207(3)] states its own criteria—"those terms on which the writings agree" plus any terms that would be provided by other Code sections. One cannot turn to subsection (2) as another Code section that would supply a term when, by its express provisions, subsection (2) simply does not apply to the transaction.

*Id.* at 573–74; *see also Coastal & Native Plant Specialties, Inc. v. Engineered Textile Prod., Inc.*, 139 F.Supp.2d 1326, 1337 (N.D.Fla.2001) ("[A] party cannot utilize section 2–207(2) to provide additional terms once a contract is formed pursuant to section 2–207(3).").

We agree with this reasoning. If we turned to Section 2–207(2) to determine the terms where the parties' writings did not create a contract, then Section 2–207(3) would be rendered meaningless. We will not do this. *See City of Carmel v. Steele*, 865 N.E.2d 612, 618 (Ind.2007) ("To effectuate legislative intent, we read the sections of an act together in order that no part is rendered meaningless if it can be harmonized with the remainder of the statute."). Thus, we rely solely on Section 2–207(3) to determine what terms are included in the contract.

Belden also argues that the parties' course of dealing is a "supplementary term" to be included by Section 2–207(3). Belden contends that the parties' course of dealing acknowledges the limitation on damages and that it is therefore included as a term of the contract.

There is a split in authorities as to whether Section 2–207(3)'s reference to "supplementary terms" includes course of performance, course of dealing, and usage of trade as defined in Section 1–205 or just the standard "gap fillers" contained in the Article 2 of the UCC. *Compare Coastal & Native Plant Specialties*, 139 F.Supp.2d at 1337 ("When a contract is formed pursuant to section 2–207(3), as here, the contract terms consist of the standard gap-filler provisions of the UCC as well as those sections relating to course of performance and course of dealing and usage of trade."), *and Dresser Industries, Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1451 (7th Cir.1992) (concluding that under the Wisconsin UCC, a court is not limited to the standardized gap-fillers

**4.** We note Belden's argument in its reply brief that "whether § 2–207(2) and or/(3) applies makes no difference here because the parties' course of dealing results in incorporation of the remedial limitation whether viewed in terms of the material alteration analysis of

subsection (2) or as a 'supplementary term' for purposes of subsection (3)." Appellant's Reply Br. p. 5 n. 5. However, for the sake of clarification, we will decide whether § 2–207(2) is applicable.

of Article 2, but may utilize any terms arising under the entire UCC, including course of performance, course of dealing, and usage of trade), *with C. Itoh & Co. (America) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228, 1237 (7th Cir.1977) ("Accordingly, we find that the 'supplementary terms' contemplated by Section 2–207(3) are limited to those supplied by the standardized 'gap-filler' provisions of Article Two."). For the sake of argument, we assume, without deciding, that the parties' course of dealing is in fact a supplementary term for purposes of Section 2–207(3).

Belden asserts that during the more than 100 transactions between the parties from 1998 to 2003, AEC never objected to the limitation on damages and, therefore, the parties' course of dealing incorporates the limitation on damages into the contract.[5] AEC responds, "since it is undisputed that AEC never gave its express assent to Belden's terms in any prior transaction throughout the parties' fifteen-year relationship, Belden has not established a course of dealing between the parties as a matter of law." Appellee's Br. p. 27.

Pursuant to Section 1–205(1), "A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Our research shows that most cases involving the repeated exchange of forms does not in and of itself establish a course of dealing between the parties that incorporates the terms of those forms into the parties' contract un-

der Section 2–207(3). *See Step–Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 103–04 (3rd Cir.1991) ("While one court has concluded that terms repeated in a number of written confirmations eventually become part of the contract even though neither party ever takes any action with respect to the issue addressed by those terms, most courts have rejected such reasoning." (footnote omitted)); *see also PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.*, 225 F.3d 974, 982 (8th Cir.2000) ("Moreover, the fact that Christy repeatedly sent its customer acknowledgment form to PCS does not establish a course of dealing; the multiple forms merely demonstrated Christy's desire to include the arbitration clause as a term of the contract.").

We agree with the reasoning set forth in *Step–Saver*:

For two reasons, we hold that the repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2–207. First, the repeated exchange of forms by the parties only tells Step–Saver that TSL *desires* certain terms. Given TSL's failure to obtain Step–Saver's express assent to these terms before it will ship the program, Step–Saver can reasonably believe that, while TSL desires certain terms, it has agreed to do business on other terms-those terms expressly agreed upon by the parties. Thus, even

---

**5.** Because we have decided that Section 2–207(3) applies and does not incorporate into a contract the same terms as would be incorporated under Section 2–207(2), we do not address Belden's arguments that the parties' repeated exchange of the same forms did not result in a material alteration or undue sur-

prise as discussed in *Waukesha Foundry, Inc. v. Industrial Engineering, Inc.*, 91 F.3d 1002, 1008–09 (7th Cir.1996), *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1336 (7th Cir.1991), *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 711–15 (7th Cir.1987).

though Step–Saver would not be surprised to learn that TSL desires the terms of the box-top license, Step–Saver might well be surprised to learn that the terms of the box-top license have been incorporated into the parties's agreement.

Second, the seller in these multiple transaction cases will typically have the opportunity to negotiate the precise terms of the parties's agreement, as TSL sought to do in this case. The seller's unwillingness or inability to obtain a negotiated agreement reflecting its terms strongly suggests that, while the seller would like a court to incorporate its terms if a dispute were to arise, those terms are not a part of the parties's commercial bargain. For these reasons, we are not convinced that TSL's unilateral act of repeatedly sending copies of the box-top license with its product can establish a course of dealing between TSL and Step–Saver that resulted in the adoption of the terms of the box-top license.

*Step–Saver*, 939 F.2d at 104 (footnote omitted). Belden's repeated sending of the order acknowledgement containing the same limitation on damages and same requirement of assent by AEC does not in and of itself establish a course of dealing between the parties showing that the parties agreed to the Belden's terms and conditions of sale. At best, it shows that Belden wanted AEC to assent to *its* terms and conditions, which AEC never did.

Belden also asserts that AEC's acceptance of a credit or refund in other instances of alleged non-conformity establishes the parties' course of dealing regarding damages. In other words, Belden argues that by foregoing consequential damages in the past, the parties have established a course of dealing in which AEC is precluded from seeking consequential damages for this alleged breach.

A course of dealing is limited to "previous conduct between the parties." § 1–205(1). Thus, the parties' conduct after the October 2003 transaction is not relevant to establish their course of dealing for purposes of the October 2003 transaction. With this in mind, we refer to the five "material return notices" from AEC to Belden cited by Belden. These forms state the material being rejected, the reason for rejection, and AEC's request for a credit. Appellant's App. pp. 67–75.

These forms do not expressly establish that AEC has forfeited its right to seek additional damages. They simply show that AEC requested a credit for non-conforming wire. Further, that AEC did not previously claim lost profits or consequential damages does not conclusively show that AEC agreed to forego such remedies in the future. Belden has not established a course of dealing in which AEC agreed to Belden's limitation on remedies as a matter of law.

In sum, we agree with the trial court's conclusion that Section 2–207(3) applies to this case and that Section 2–207(3), not Section 2–207(2), controls the terms of the parties' agreement. We also conclude that Section 1–205 does not establish a course of dealing in which AEC agreed to the limitation on damages. The trial court properly granted summary judgment in favor of AEC as to the issue of the applicability of Belden's limitation on damages.

### II. Express Warranty

 Belden also argues that the trial court erroneously concluded that Belden created an express warranty regarding compliance with its quality control pro-

gram.[6] "Where an agreement is entirely in writing, the question of whether express warranties were made is one for the court." *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1082 (Ind. 1993), abrogated in part on other grounds by *Hyundai Motor America, Inc., v. Goodin*, 822 N.E.2d 947 (Ind.2005). More specifically, if all of the representations upon which the parties rely were in writing, the existence of express warranties is a question of law. *See id.* Because the alleged warranty is based on written exchanges, whether the writings are sufficient to create an express warranty is a question of law appropriate for summary judgment.

In 1994, AEC indicated to its suppliers that it was adopting a quality control program to satisfy the requirements of AEC's purchasers, automobile manufacturers. AEC held a "supplier day" meeting explaining its quality control program. Two Belden representatives attended the meeting. AEC explained what its suppliers needed to do to become certified by AEC and that a certified supplier's product receives " 'ship-to-stock' status, bypassing inspection, supplier is then placed on an approved supplier list." Appellee's App. p. 120. Part of AEC's quality control program included an extensive production part approval process ("PPAP"). *Id.* at 122.

In 1996, in an attempt to comply with AEC's quality control program, Belden completed a survey by AEC and provided detailed information regarding its ISO

9000 certification, an international accreditation, including the date of issuance, the number, the reference standard, the accreditation body stamp, and the scope of the registration. In 1997, Belden sent a letter to AEC stating in part:

As I mentioned, all of the Belden electronic plants are ISO certified. The plant that manufactures YR29803 (AEC PN# 922–121) is ISO 9002 certified and the Belden Engineering Center is ISO 9001 certified. . . .

The attached documents are the documents and system by which Belden controls and inspects the process to manufacture YR29803. These documents encompass raw materials to finished product specifications and operator instructions. . . . *I have submitted these in place of the PPAP requirements with the intention of your approval in meeting your supplier requirements* . . . .

Appellant's App. p. 97 (emphasis added). Among other things, the attached documents indicated that Belden used materials supplied by Quantum.[7] In 1997, AEC approved Belden's PPAP.

In addition to the 1996 and 1997 statements, in 2001, Belden issued a news release that stated, "Belden Is First UL Registered Wire and Cable Company to Receive ISO 9001:2000[.]" Appellee's App. p. 63. The news release went on to state, "ISO 9001:2000 is recognized and accepted internationally as a baseline to quality management system requirements. This

6. On a 1996 "AEC Supplier QS–9000 Survey," Belden stated that it did not intend to seek QS–9000 registration. Appellant's App. p. 120. On that same form, however, Belden was asked, "If you have received the ISO 9000 certificate, please answer the following. . . ." *Id.* Accordingly, it appears, based on Belden's responses, that QS 9000 and ISO 9000 are two different standards. We reject Belden's argument intertwining the two.

7. Our references to Quantum do not refer to just the brand name but also include Quantum's physical specifications. No one disputes the trial court's finding that Dow's insulation "shows lower physical properties for tensile strength, elongation, and other physical properties than the insulation material supplied by [Quantum]." Appellant's App. p. 16.

International Standard specifies the requirements for the quality management system that is used to address customer satisfaction, by meeting customer expectations and applicable regulatory requirements." *Id.*

Belden claims that these 1996 and 1997 communications did not amount to an express warranty for purposes of the October 2003 contract. Section 2–313 of the UCC provides:

(1) Express warranties by the seller are created as follows:

(a) any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c) any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

■ "An express warranty requires some representation, term or statement as to how the product is warranted." *Martin,* 621 N.E.2d at 1082. There does not seem to be a dispute that in 1996 and 1997 Belden made express warranties regarding its wire. Instead, the issue is whether the 1996 and 1997 statements by Belden regarding certification created an express warranty that extended to the October 2003 contract.

Based on the designated evidence, we believe Belden's compliance with AEC's quality control program was essential to its contracts with AEC and was intended to extend to the parties' repeated contracts. First, Comment 7 to Section 2–313 provides in part, "The precise time when words of description or affirmation are made or samples are shown is not material. The sole question is whether the language or samples or models are fairly to be regarded as part of the contract." Thus, although Belden made its initial representations in 1996 and 1997, there is no indication that those representations were limited in time, that Belden subsequently disclaimed its compliance with AEC's quality control standards, or that AEC changed those standards. As the trial court observed, "it is illogical to believe that [AEC] intended to rely in this representation for only one (1) shipment of Wire and then to understand that Belden would follow whatever quality procedures it wanted as to future shipments." Appellant's App. pp. 26–27.

Further, Comment 5 of Section 2–213 provides in part, "Past deliveries may set the description of quality, either expressly or impliedly by course of dealing. Of course, all descriptions by merchants must be read against the applicable trade usages with the general rules as to merchantability resolving any doubts." Belden claims that if the parties' course of dealing was insufficient to incorporate the limitation on damages into the parties' contract, then the course of dealing is also insufficient to establish an express warranty. We disagree. Irrespective of whether the course of dealing established that AEC

assented to Belden's proposed limitation on damages, the parties' course of dealing established that Belden made an express warranty regarding its compliance with the quality control standards. The limitation on damages and the express warranty are unrelated issues—there is no correlation between the two.

A course of dealing is conduct "fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." § 1–205(1). It is undisputed that Belden's wire complied with the AEC's quality control requirements for the parties' more than 100 transactions, until October 2003, when Belden switched from Quantum insulation to the Dow insulation without informing AEC of the changes. *See* Appellant's Br. p. 26. Based on Belden's 1996 and 1997 assertions regarding its compliance with AEC's quality control program and Belden's repeated production of wire containing Quantum insulation, Belden expressly warranted its compliance with AEC's quality control program.

That Belden and AEC did not repeatedly or routinely "communicate" regarding Belden's continued use of Quantum insulation does not undermine the parties' course of dealing. Appellant's Br. p. 26. The very point of a course of dealing is to allow the parties' prior actions create a basis of common understanding. This is exactly what Belden's 1996 and 1997 assertions taken with its continued use of Quantum insulation did.

The fact that AEC provided technical specifications prepared by an engineer that did not include the physical qualities of the wire does not negate Belden's express warranty. AEC's October 2003 purchase order refers to YR29803; this is the type of wire referred to in Belden's 1997 letter and the materials list. Although AEC's specific needs may have varied from order to order, Belden warranted the specifications of the YR29803 wire and AEC purchased YR29803 wire, subject to the engineered specifications.

Belden points out that AEC changed its specifications with each of its orders, yet "none of these changes relate to the physical properties, tensile strength and elongation or the type of insulation compound...." Appellant's Br. p. 25. This shows that AEC did not want to change any of these pre-existing requirements. This fact is bolstered by AEC's statement on its order form, "Material Certification Required." Appellant's App. p. 96. Belden does not point to any designated evidence showing that AEC no longer required that Belden's materials comply with its quality control program or that Belden informed AEC that it was no longer complying with such.

Finally, in a footnote Belden contends that an express warranty can only be created when a seller states a fact of which the buyer is ignorant and claims that because AEC was a sophisticated merchant "the proposition is at once facially implausible...." Appellant's Br. p. 27 n. 30. Assuming Belden raised this issue before the trial court, we disagree with its reading of *Martin*. A complete reading of the language upon which Belden relies shows:

> An express warranty requires some representation, term or statement as to how the product is warranted. Stated another way, an express warranty may be created if the seller asserts a fact of which the buyer is ignorant, but not if the seller merely states an opinion on a matter on which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment. Thus, a seller's factual statement that a machine had a new engine constituted an express warranty. Assurances by a seller that carpet would be replaced if any defects

surfaced within one year of purchase was sufficient to create an express warranty.

*Martin,* 621 N.E.2d at 1082. We do not take this language to mean that a buyer has to be unsophisticated or generally ignorant before an express warranty can be created. Instead, we believe this language means that if a seller asserts a fact about which the buyer does not have knowledge to the contrary, then the seller creates an express warranty. There is no indication that AEC knew that Belden would supply wire with physical properties other than what it asserted in its 1996 and 1997 letters. This argument is without merit, and the trial court properly granted summary judgment in favor of AEC on this issue.

## Conclusion

Belden's limitation on damages is not a term of the parties' contract and, by complying with AEC's quality control program, Belden expressly warranted its compliance with AEC's quality control program, which included the use of Quantum insulation. The trial court properly granted AEC's partial motion for summary judgment and denied Belden's partial motion for summary judgment. We affirm.

Affirmed.

CRONE, J., and BRADFORD, J., concur.