In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4090

THOMAS K. ALLEN, JR.,

Plaintiff-Appellant,

v.

CEDAR REAL ESTATE GROUP, LLP,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 98 C 633--James T. Moody, Judge.

Argued September 6, 2000--Decided January 3, 2001

Before Manion, Kanne, and Diane P. Wood, Circuit
Judges.

Kanne, Circuit Judge.  Thomas Keith Allen, an
Indiana citizen, made a written offer to Cedar
Real Estate Group, LLP ("Cedar"), an Iowa
Partnership, to purchase a 6.2 acre parcel of
land for $360,000. Cedar made a counteroffer
which minimally changed the terms of the original
offer, and Allen accepted. After an environmental
audit revealed unexpected soil and groundwater
contamination, the parties negotiated
unsuccessfully for approximately four months in
an attempt to allocate the costs of environmental
remediation. Eventually, due to the parties'
inability to reach an agreement, Cedar terminated
the agreement and informed Allen that it was
placing the property back on the market. In
response, Allen notified Cedar that the parties
had a binding agreement and insisted on closing
the transaction. When Cedar refused, Allen filed
suit against Cedar in federal district court,
properly alleging diversity jurisdiction and
asking for damages and/or specific performance of
the land sale contract. Because we find that no
contract existed, we affirm the district court's
grant of summary judgment for the defendant-
appellee, Cedar Real Estate Group.

I.  History

At the center of the dispute in this case is a

6.2 acre parcel of real estate located in Lake County, Indiana ("the property") owned by Cedar. In May of 1998, Cedar listed the property for sale with Richard E. Weiss, a real estate agent. A large trucking company, CRST International, used the property as a terminal prior to its placement on the market. At that time, CRST International used five underground storage tanks ranging in volume from 500 to 10,000 gallons to store fuel and heating oil on the property. In 1990, the four largest of these tanks were removed from the property. The smallest tank was left in place and filled with concrete. As required by Indiana state environmental regulations, CRST International filed a closure report with the Indiana Department of Environmental Management ("IDEM") detailing the removal and closure of the underground storage tanks.

On June 4, 1998, through his real estate agent, Howard Cyrus, Allen offered to purchase the property from Cedar for $360,000. Allen made his offer on a preprinted purchase agreement that contained standard boilerplate contract provisions concerning the method of payment, taxes and assessments, and the risk of loss. The purchase agreement also specified that the sale of the property was "as is" and that "time periods specified in this Agreement expire at midnight on the date stated unless the parties agree in writing to a different date and/or time."

In addition to the preprinted purchase agreement, a typewritten page entitled "FURTHER CONDITIONS" was attached to Allen's offer. In pertinent part, this additional page provided the following:

This offer to purchase is subject to purchaser[']s approval of the following:

1) After purchaser[']s review of the Environmental Disclosure Document for Transfer of Real Property (see attached), at purchaser[']s option, a current Phase 1 and Phase 11 Environmental Audit with soil borings will be ordered. Cost not to exceed $5,000 and to be split on 50/50 basis between purchaser and seller. Audits to be completed within thirty (30) day period after acceptance of this proposal by sellers, with a reasonable extension of time, if needed. Seller shall provide completed copy of Disclosure Document with accepted copy of purchase agreement[.] In addition, sellers agree to provide purchasers with all existing environmental data and underground tank closure documents from the State of Indiana relating to the subject property.

The bottom of the additional page also contained the following footnote referring to the above paragraph, "Regarding #1--Mr. Allen will not request environmental audit if he is satisfied with the contents of the disclosure document. Mr. Allen will make the decision after it is reviewed." Although the purchase agreement specifically gave Allen the right to investigate the property to determine the existence of environmental contamination, it did not specify how such a discovery would affect the agreement to sell the property. The purchase agreement named July 15, 1998 as the closing date but also allowed a reasonable extension of time "for correcting defects in the Property noted in any inspection report."

On June 9, 1998, Cedar made a written counteroffer to Allen. The counteroffer modified the first paragraph of the further conditions to provide that:

[w]ithin five (5) business days after this Counter Offer is accepted by Purchaser, Seller shall provide Purchaser with a completed copy of the Environmental Disclosure Document for Transfer of Real Property and provide purchaser with all existing documentation, environmental data and underground tank closure documents from the State of Indiana regarding the subject property which Seller has in its possession. Purchaser shall then have three business days to review the information received from Seller and to exercise its option as provided in paragraph (1).

On June 12, 1998, Cyrus delivered Allen's signed acceptance of the counteroffer to Weiss.

In accordance with the agreement, Cedar delivered the appropriate environmental disclosure documents to Allen. After reviewing these documents, Allen decided to exercise his option to order an environmental audit. He engaged the services of Enviro Solutions, Inc. ("ESI") to perform an environmental assessment of the property. ESI representatives visited the property on June 19 and July 14, 1998. ESI also reviewed documents, spoke with a representative of CRST International, and interviewed personnel from various state and local governmental agencies. On July 29, 1998, ESI issued its environmental assessment of the property. ESI concluded that:

[t]he property does exhibit adverse environmental issues in the form of apparent diesel fuel contamination in the general area of the former site of two 10,000 gallon diesel fuel tanks. Both

soil and groundwater are impacted. The full extent of the contamination is not known. A realistic estimate of potential clean up costs can not be prepared based on available information. ESI recommends that additional investigatory actions take place in order to further delineate the extent of the contamination. At that point, it may be possible to estimate the potential clean up costs.

After receiving this memorandum from ESI, Allen submitted it to Cedar. On August 7, 1998, Cyrus sent a memorandum to Weiss stating that Allen was "prepared to close th[e] transaction within thirty (30) days after receipt of an acceptably clean environmental report for the entire property indicating it meets state standards." The memorandum said that Allen was willing to pay fifty percent of the costs of further environmental investigation up to $5,000 and fifty percent of the costs of remediation up to $10,000. The memorandum also stated that:

I cannot stress enough, that Mr. Allen wants this property and is willing to accommodate the owner in terms of the time necessary to solve these problems plus his contribution toward their solution.

At this time, we believe that all responsibility for future investigations, remediation, and preparation of a final environmental report is the owner's, or his agent (you).

Upon receipt of this memorandum, Weiss contacted John M. Smith, one of Cedar's partners, to determine Smith's position with respect to sharing remediation costs with Allen. Smith told Weiss that he had not changed his position and that sale of the property would be "as is."

In an attempt to save the deal, Weiss brought in Environmental Restoration Systems ("ERS"), an environmental contractor with whom he had worked in the past. On August 18, 1998, a meeting was held between Cyrus, Allen, Weiss, and a representative of ERS. The purpose of this meeting was to attempt to determine the potential costs of further site investigation and eventual remediation. A few days after the meeting, ERS tentatively estimated that further investigation and remediation would cost $30,335.

After receiving this information from ERS, Weiss faxed a letter to Cyrus reiterating that the sale of the property would be "'as is' with the buyer to address the environmental condition." In the letter, Weiss suggested that Allen should consider revising his offer. A week later, on

September 4, Weiss softened his position. He wrote another letter to Cyrus, this time indicating that Cedar would agree to sell the property as specified in the purchase agreement "with the provision that the cost of the environmental clean-up be split equally." The letter stated that a mutually acceptable remediation agreement would be prepared and become part of the purchase agreement.

On September 15, Weiss informed Allen that Cedar was looking into dealing with other parties "due to the unresolved contractual issues associated with the Purchase Agreement of June 4, 1998." The next day, Cyrus faxed a note to Weiss proposing that Allen contribute fifty percent of the costs of remediation work up to a total of $25,000. In response, Weiss opined that "[t]his is the type of approach that the Smiths will understand" and inquired whether Allen would agree to increase the remediation cap to $35,000. Cyrus responded that Allen would be willing to offer to pay one half of any remediation work that needed to be done up to $35,000.

A few days after Allen had offered to pay half of the remediation costs up to $35,000, Cyrus sent a letter advising Cedar "for information purposes only" that Allen had obtained a legal opinion which concluded that Cedar had certain obligations under Indiana law as a result of the discovery of possible environmental contamination on the property. Weiss replied that Cedar's preference was to sell the property "as is" with the buyer being responsible for the entire cost of remediation. Weiss also informed Allen that Cedar had received three offers on the property and that he had instructed potential buyers to communicate their "final and best offer" to Cedar by noon on October 2, 1998. On October 1, 1998, in response to this communication, Allen's attorney advised Cedar that there was an existing contract between Cedar and Allen. The letter stated:

It is the position of Mr. Allen that the purchase agreement remains in full force and effect and is a viable contract between the parties. The effort by Cedar Rapids Realty Group to breach this agreement by entering into agreements of sale with other parties will be resisted.

In the meantime, Mr. Allen remains ready, willing and able to complete the inquiry and determine the significance, if any, of the existing environmental defect.

Upon receipt of this letter, Cedar immediately informed Cyrus that the agreement was terminated

and directed him to return Allen's earnest money.

  Almost four weeks later, on October 28, 1999, Allen's attorney wrote to Cedar's attorney indicating that Allen was ready to close the transaction for the original purchase price of $360,000. According to the letter, the property would be submitted to the Voluntary Remediation Program of the Indiana Department of Environmental Management, and the costs of such remediation would be forwarded to Cedar. Cedar never responded to this letter, and Allen filed suit in federal district court. The district court granted summary judgment for the defendant, finding that Allen's approval of the environmental audit was an unsatisfied condition precedent to the existence of a contract.

II.  Analysis
A.  Standard of Review

  On appeal, Allen argues that the district court erred in granting summary judgment for Cedar by finding that no contract existed between Allen and Cedar. We review de novo the district court's grant of summary judgment. See Matney v. County of Kenosha, 86 F.3d 692, 695 (7th Cir. 1996). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In determining whether a genuine issue of material fact exists, we must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). If, however, the record as a whole "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" See Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); see also Lindemann v. Mobile Oil Corp., 141 F.3d 290, 294 (7th Cir. 1998).

B.  Contract Interpretation

  In a diversity case, we apply federal procedural law and state substantive law. See Erie R.R. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). Rules of contract interpretation are treated as substantive. See Bourke v. Dun & Bradstreet, 159 F.3d 1032, 1036

(7th Cir. 1998). The parties agree that Indiana law governs our interpretation of the purchase agreement.

According to Indiana law, the construction of an unambiguous written contract is a question of law for the court. See Bicknell Minerals, Inc. v. Tilly, 570 N.E.2d 1307, 1311 (Ind. Ct. App. 1991). If a contract is ambiguous or uncertain, its meaning is to be determined by extrinsic evidence, and its construction is an issue of fact. See id. If, however, an ambiguity arises because of the language used in the contract and not because of extrinsic facts, its construction is purely a question of law to be determined by the court. See id.; First Federal Savings Bank v. Key Markets, Inc., 559 N.E.2d 600, 603 (Ind. 1990); see also Keating v. Burton, 617 N.E.2d 588, 592 (Ind. Ct. App. 1993) (holding that the question of whether an undisputed set of facts establishes a contract is a matter of law).

Allen claims that, because the contract does not explicitly lay out the consequences of an unfavorable environmental report, it is ambiguous and thus an issue for the fact finder. This argument fails for two reasons. First, a contract is not ambiguous "simply because a controversy exists between the parties, with each favoring a different interpretation." Abbey Villas Development Corp. v. Site Contractors, Inc., 716 N.E.2d 91, 100 (Ind. Ct. App. 1999) (citing Stevenson v. Hamilton Mut. Ins. Co., 672 N.E.2d 467 (Ind. Ct. App. 1996)). A contract is ambiguous only when it is susceptible to more than one interpretation. See id. As will become evident from the discussion in Part II.C below, reasonable persons could not disagree about the contract in this case. Secondly, even if a contract is ambiguous, its interpretation is still a question of law if the ambiguity exists because of the language used in the agreement and not because of extrinsic facts. See, First Federal Savings Bank, 559 N.E.2d at 604 (Ind. 1990). In this case, where there is no dispute about the extrinsic evidence, any ambiguity is a result of the language used in the contract. Thus, the determination of the existence of a contract is a matter for the court.

C.   Condition Precedent

Allen argues that the contract to sell the Cedar property contained all essential terms and was complete and binding from the time that he signed and accepted Cedar's counteroffer. The district court, however, found that the agreement was not complete when signed because of the language that Allen inserted in the contract making Allen's "offer to purchase . . . subject

to purchaser[']s approval of the following." The district court held that the insertion of this language in the purchase agreement created a condition precedent that needed to be fulfilled before the agreement became an enforceable contract.

A condition precedent is "either a condition which must be satisfied before an agreement becomes a binding contract or a condition which must be fulfilled before the duty to perform an already existing contract arises." See Dvorak v. Christ, 692 N.E.2d 920, 924 (Ind. Ct. App. 1998); Worell v. WLT Corp., 653 N.E.2d 1054, 1057 (Ind. Ct. App. 1995). Allen argues that the clause that made his offer "subject to Purchaser's approval" is not a condition precedent to contract formation but rather a condition precedent to performance of the contract. We disagree.

Contracts must be interpreted to give effect to the intentions of the parties as expressed in the four corners of the instrument. See Fetz v. Phillips, 591 N.E.2d 644, 647 (Ind. Ct. App. 1992); see also First Federal Sav. Bank of Indiana v. Key Markets, Inc., 559 N.E.2d 600, 603 (Ind. 1990). We attempt to determine the intent of the parties at the time the contract was made by examining the language that the parties used to express their rights and duties. See I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co., 695 N.E.2d 1030, 1034 (Ind. Ct. App. 1998). In this case, the contract language--language inserted by Allen--shows his intent to condition his offer on an acceptable environmental report. First, the paragraph that gives Allen the right to order an environmental audit is entitled "Further Conditions." In addition, the paragraph begins by noting that, "this offer to purchase is subject to Purchaser's approval of the following:" (emphasis added). Allen's choice of the word "offer" is telling. This language makes it clear that Allen conditioned his offer on the right to order an environmental audit. The only reasonable interpretation of this language is that Allen intended to be able to opt out of the agreement if the property turned out to be contaminated.

In addition, contracts are to be read as a whole to harmonize all provisions. See Peoples Bank & Trust Co. v. Price, 714 N.E.2d 712, 717 (Ind. Ct. App. 1999). When interpreting a contract, a court must "make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless." Whitley County Teachers Ass'n v. Bauer 718 N.E.2d 1181 (Ind. Ct. App. 1999). The District Court found that the only way to harmonize Allen's inclusion of the phrase "this

offer is subject to purchaser[']s approval" with the provision allowing Allen to order an environmental audit is by understanding Allen's approval of the environmental audit to be a condition precedent to the formation of the contract. We agree. The right to order an environmental audit would be rendered completely meaningless if Allen had an obligation to purchase the property regardless of the results. Thus, we hold that Allen's approval of the environmental investigation is a condition precedent to the formation of the contract.

Because the agreement contained a condition precedent to the formation of the contract, an enforceable contract only exists if the condition precedent was met. We hold that it was not. On August 7, after receiving the results of the environmental audit conducted by ESI, Allen's agent sent a memorandum to Cedar stating that Allen was willing to close on the property within thirty days of an "acceptably clean" environmental report. Although the memo stressed that Allen was still interested in the property, it also stated that "[a]t this time we believe that all responsibility for future investigations, remediation, and preparation of a final environmental report is the owner's, or his agent (you)." By sending this memorandum, Allen made it clear that the condition precedent--an acceptable environmental report--had not been met. Allen was not willing to accept the property in an "as is" condition without changing other terms of the agreement. Allen again showed his refusal to accept the contract as written in his letter of September 21, 1998. The letter informed Cedar that Allen had obtained a legal opinion that concluded that Cedar was at least partially liable for the contamination on the property. Although Allen claims that this letter advised Cedar of its remedial obligations with respect to the property for "information purposes alone," the letter made it very clear that Allen was not willing to purchase the property "as is."

All of the subsequent communications between Allen and Cedar were simply offers and counteroffers that never resulted in a new contract. Under Indiana law, an acceptance that differs from the terms of an offer--a counteroffer--is considered a rejection. See Kokomo Veterans, Inc. v. Schick, 439 N.E.2d 639, 644 (Ind. Ct. App. 1982) (citing Uniroyal, Inc. v. Chambers Gasket & Mfg. Co., 380 N.E.2d 571 (Ind. Ct. App. 1978)). Such a counteroffer must be accepted by the original offeror in order to form a contract. Id. No such counteroffer was accepted here.

Allen argues that liability for environmental

contamination is determined by state law and was not at issue in the contract. He argues that the negotiations that took place after the discovery of environmental contamination were simply secondary discussions to allocate the cost of environmental responsibility that would have otherwise fallen on Cedar. Allen argues that as a previous owner/operator, Cedar was at least partially liable for remediation costs under Indiana environmental law even if the property was sold pursuant to an "as is" contract. Although he does not explicitly say this, Allen seems to be arguing that the "as is" portion of the contract (as Cedar understood it) would not have been enforceable under Indiana Environmental law. Thus, he would have been in a better position if he had simply closed on the property and then filed with IDEM to force Cedar to pay for remediation.

Section 13-23-13-10(a) of the Indiana Code, pertaining to underground storage tanks, does provide that, "an indemnification agreement, a hold harmless agreement, or other similar agreement or conveyance is not effective to transfer the liability imposed under section eight of this chapter." Ind. Code (1998). While Allen is correct that section 13-23-13-10(a) prevents the transfer of liability for underground storage tanks, section 13-23-13-10(b) does allow agreements to insure, hold harmless, or indemnify. We express no opinion as to whether the purchase agreement signed by Allen and Cedar would have been considered an agreement by Allen to indemnify Cedar from rehabilitation costs. It is not relevant here, as Allen explicitly made his offer "subject to purchaser's approval" of an environmental audit. There are many reasons why a purchaser would be hesitant to buy a piece of property that was environmentally contaminated, even if another party was responsible for the remediation costs. Whether Allen had one of these reasons in mind when he inserted the condition precedent or whether he was misinformed about Indiana environmental law is immaterial. Allen specifically inserted the condition precedent requiring his approval of the environmental audit into the contract, and now he must accept the consequences of his decision.

D.  Waiver

Allen correctly points out that a condition precedent in a contract that exists solely for one party's benefit can be waived by that party. See Salcedo v. Toepp, 696 N.E.2d 426, 435 (Ind. Ct. App 1998) (citing Terre Haute Regional Hospital Inc. v. El- Issa, 470 N.E.2d 1371, 1379 (Ind. Ct. App. 1984)). A party may waive a condition precedent expressly or by conduct. See

id at 435; Parrish v. Terre Haute Savings Bank, 431 N.E.2d 132, 135 (Ind. Ct. App. 1982). It is undisputed that Allen never expressly waived the condition, and nothing in his conduct suggested that he was willing to waive it. Allen makes much of the fact that he never threatened to walk away from the deal, but this by itself is not enough. Although Allen's conduct showed that he was still interested in the property, he never suggested that he was willing to waive the condition precedent by purchasing the property "as is." Allen's offer on October 28, 1998 to purchase the property "as is" and let Indiana environmental statutes determine who would bear remediation costs was too little, too late to constitute waiver. This offer not only came four weeks after Cedar notified Allen that the contract was terminated, but it still did not agree to purchase the property "as is."

Allen does not argue that he waived the condition precedent. Instead, he argues that because he had the option to waive the condition precedent, Cedar improperly terminated the agreement. Allen's theory is that when he received the environmental report, he had two choices: accept the property in its current environmental state or walk away from the deal. According to Allen, because he had not yet decided which of these two courses of action to pursue, the agreement was still in force. There are two problems with this argument. First, it is inaccurate. As discussed above, Allen already made clear that he was not willing to accept the contaminated property "as is." Second, even if we were to accept Allen's contention that he had not yet determined whether he was willing to waive the condition precedent, his argument still fails. If the agreement remained in force until Allen affirmatively rejected the agreement, Cedar would be required to wait indefinitely. We can not accept this construction of the parties' agreement. By the time Allen offered to close on the property, the closing date had long since passed. Although the contract provided that a reasonable time would be allowed to correct defects in the property, no extension was made. Allen argues that both parties assumed that the date of closing had been extended. It is uncontroverted, however, that no extension was made in writing as required by the purchase agreement. Thus, although Allen did at one point have the right to waive the condition precedent to the formation of the contract, all indications suggest that Allen was not willing to waive it.

III. Conclusion

Because we find that no enforceable contract existed between the parties, the judgment of the

district court granting the motion for summary
judgment is AFFIRMED.