THE BEANSTALK GROUP,
INC., Plaintiff,

v.

AM GENERAL CORPORATION and
General Motors Corporation,
Defendants.

No. 00 CV 0525 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

March 30, 2001.

Thomas J. LaFountain, John D. LaDue, Joseph J. Jensen, Eric W. Seigel, Robert G. Devetski, South Bend, IN, for plaintiff.

Mark D. Boveri, Victoria L. Nilles, South Bend, IN, for defendant.

### MEMORANDUM AND ORDER

ALLEN SHARP, District Judge.

This cause is before the Court on the Defendants' Motion to Dismiss all five counts of the Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Plaintiff responded with a Cross Motion for Partial Summary Judgment on Counts One and Two of the Complaint. The controversy between these parties arose out of a contract between the Plaintiff, The Beanstalk Group, Inc. ("Beanstalk"), and one of the Defendants, AM General, for the right to market the HUMMER trademark, owned by the Defendant. The Plaintiff claims that AM General and General Motors breached the contract when AM General sold the HUMMER name to General Motors. Briefs, responses, and replies have been submitted by the parties on all motions, and the issues are now ripe for ruling.

### I. JURISDICTION

Jurisdiction is premised upon complete diversity of citizenship pursuant to 18 U.S.C. § 1332(a). The amount in controversy is alleged by the Plaintiff to be well in excess of the jurisdictional amount, $75,000.

### II. RELEVANT FACTS

The Plaintiff, Beanstalk, is a New York corporation with its principal place of business in New York. Compl. at ¶ 1. It is engaged in the business of licensing trademarks and other intellectual properties on behalf of the owners. Id. at ¶ 6. The Defendant, AM General, is a Delaware Corporation with its principal place of business in South Bend, Indiana. Id. at ¶ 2. General Motors Corporation ("GM") is also a Delaware corporation, with its principal place of business located in Detroit, Michigan. Id. at ¶ 3.

AM General manufactures automobiles under various trade names, including the HUMMER title at issue in this litigation. Id. at ¶ 7. On February 6, 1997, Beanstalk entered into a Representation Agreement (the "Agreement") with AM General to market certain of its trademarked names. Id. at ¶ 8. Because the terms to this Agreement are central to resolving the dispute between these parties, the relevant portions are set forth in detail.

1. *Definitions.*

(a) *"Property"* shall mean the name, symbols, designs, logos, packaging, copyrights and trademarks of HUMMER, and such other trade names, trademarks, copyrights, logos and other ancillary rights relating thereto to the fullest extent that Owner has, or may hereafter obtain, title or right thereto. Id. at 1.

(b) The term *"License Agreement"* as used in this Agreement shall be deemed to include any agreement or arrangement, whether in the form of a license or otherwise, granting merchandising or other rights in the Property.

2. *Nature of Representation.* Owner hereby engages Beanstalk, and Beanstalk accepts such engagement, to act as its sole and exclusive non-employee representative . . . (i) for the purpose

of conceiving and establishing licensing programs in the Property, (ii) to seek out persons, firms or corporations to enter into License Agreements for use of the Property, and (iii) to solicit and negotiate agreements on the Owner's behalf with an y person, firm or corporation in the Territory granting licenses to use the property and all trademarks, trade names, service marks, copyrights ... in connection with the manufacture, distribution, sale, advertising and promotion of any and all articles of merchandise or commerce, services, endorsements or any other form of exploitation of the business of the person, firm or corporation so licensed."

Id. at 2.

**4.** *Compensation of Beanstalk.*

(a). As complete and total compensation for Beanstalk's services hereunder, Beanstalk shall be entitled to receive thirty-five percent (35%) of the gross receipts or other compensation or the value of other consideration actually received on Owner's behalf (i) under any License Agreements entered into and executed and/or substantially negotiated prior to the date of termination or expiration of the Agreement ... and (ii) under any initial term, renewals, extensions or modifications of any such License during the term of this Agreement, and any renewal or extension thereof, whether prior to or after termination or expiration hereof ... Beanstalk's share of advances, guarantees, royalties, or other compensation under any License Agreement once fully executed, cannot be waived, modified or amended by Owner without Beanstalk's prior written consent.

Id. at 3.

**6.** *Termination.*

(a) The term of this Agreement shall be for a period beginning February 1, 1997 through December 31, 2000 ("the first period"), unless otherwise terminated pursuant to the provisions hereof.

(b) If this Agreement has not been terminated prior to the expiration of the first period, Beanstalk is not in default under any provision of this Agreement, and the total amount of minimum guarantees paid, due, and contracted for, plus all royalty overages, under License Agreements entered into pursuant to this Agreement during the first period exceeded $250,000 then this Agreement shall be automatically renewed for one two-year period.

Id. at 4.

**7.** *Effect of Expiration or Termination.* Upon expiration or in the event this Agreement is terminated for any reason whatsoever, neither party shall have any obligations to the other except as set forth in Paragraphs 4(a), 5 and 8 hereof.

Id. at 5.

**11.** *Right of Owner to Use Property.* Nothing in this Agreement shall be construed to limit the right of Owner to use the Property in connection with any commercial or other activity provided it does not conflict with the terms of this Agreement.

**12.** *Right of Owner to Veto License Agreements.* Owner shall have the absolute right to veto, without cause and at its sole discretion, any program, person, firm, corporation or proposed or negotiated license or License Agreement ...

Id. at 6.

**14.** *Expenses.*

(c) ... If Owner decides to discontinue marketing any of the titles which constitute the Property, Owner shall give Beanstalk ninety (90) days prior written notice of such intention. Upon receipt

of such notice, Beanstalk agrees to cease all exploitation of that title.

Id. at 7.

The facts are not in dispute. AM General's Resp. in Opp. at 3; Pl.'s Reply at 1–2. Beanstalk performed successfully under the Agreement, negotiating approximately twenty-four License Agreements for the Property on the Defendant's behalf. Compl. at ¶ 14. The value of those agreements grew from $63,750 in 1997, to $438,841 in 1998, to $1,088,866 in 1999. Id. However, circumstances changed for AM General when it entered into a joint manufacturing venture with General Motors (GM) to produce a new version of the HUMMER vehicle. Id. at ¶ 17. The AM General/GM Agreement, provided that GM would (i) design, engineer, certify and release a new version of the HUMMER vehicle, (ii) lend AM General as much as $235,000, without interest, the proceeds of which are to be used for, among other things, the construction of a new factory; (iii) acquire an option on as much as forty percent of AM General's stock; and (iv) guarantee that it would purchase a minimum number of the new HUMMER vehicles. Id.

This agreement was a multi-faceted business transaction which included, as part of the transaction, the transfer of ownership of the HUMMER name, together with all incidents of ownership, to General Motors. Def.'s Resp. at 3–4. Initially, the Defendants sought to amend the representation agreement to specifically exclude from its definition of License Agreements any "agreements between [AM] and any individual for the purpose of producing motor vehicles or motor vehicle parts and accessories, even if rights in the Property are licensed, transferred, or otherwise involved in such agreements." Pl.'s Mem. in Supp. at 6, *citing* Def.'s letter dated February 16, 1999. Beanstalk refused to amend the Agreement. Id.

AM General and GM went forward with their plans for the new HUMMER vehicle, and on or about December 21, 1999, entered into an agreement under which AM General conveyed to GM ownership of the HUMMER trademark as part of the transaction. Id.; Def.'s Mem. in Supp. at 3. After entering this agreement, the Plaintiff alleges that AM General informed Beanstalk that Beanstalk would have to look to GM for any further dealings regarding the HUMMER trademark because AM General no longer owned the trademark. Pl.'s Mem. in Supp. at 6. GM then informed Beanstalk that it was canceling the Agreement, and that Beanstalk would receive no compensation with respect to any License Agreement entered into after December 31, 1999, or with respect to any renewal or extension of any existing License Agreements. Id.

On August 28, 2000, Beanstalk filed this action asserting claims against AM General and GM for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and tortious interference with a contract. The Defendants filed a motion to dismiss all counts for failure to state a claim upon which relief can be granted, and the Plaintiffs filed a cross-motion for summary judgment on claims one and two for breach of contract. The Court has carefully examined the contract and considered the submissions of the parties, and now rules as follows.

## III. STANDARD OF REVIEW

### A. Motion to Dismiss

The Defendants have moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. To succeed on a motion to dismiss under Rule 12(b)(6), the defendant must prove that even assuming the plaintiff's allegations are true, the complaint fails to

state a claim upon which relief can be granted. In reviewing a motion to dismiss, the court looks only at the legal sufficiency of the complaint and not the merits, *Triad Assoc., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir.1989), *cert. denied*, 498 U.S. 845, 111 S.Ct. 129, 112 L.Ed.2d 97 (1990), taking the plaintiff's factual allegations as true and drawing all reasonable inferences in the plaintiff's favor. *Veazey v. Communications & Cable of Chicago, Inc.*, 194 F.3d 850, 853 (7th Cir.1999).

This does not mean, however, that the court is required to accept legal conclusions that may be alleged in the complaint or that may be drawn from the pleaded facts. *Vaden v. Village of Maywood*, 809 F.2d 361, 363 (7th Cir.), *cert. denied*, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381 (1987); *see also, Milwaukee v. Saxbe*, 546 F.2d 693, 704 (7th Cir.1976). Dismissal is appropriate if it appears beyond doubt that no relief could be granted under any set of facts that could be proved in support of the plaintiff's claim. *Veazey*, 194 F.3d at 853, *citing Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In other words, if it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate. *Id.*, *see also, Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir.1995).

As a general rule, on a motion to dismiss, the Court cannot look outside the face of the complaint.[1] Courts may, however, consider exhibits attached to the complaint as part of the pleadings. *Webster v. New Lenox School Dist. No. 122*, 917 F.2d 1004 (7th Cir.1990). The Plaintiff attached a copy of the Representation Agreement to its Complaint as Exhibit A, therefore, the Court may consider it as part of the pleadings for purposes of the Defendants' Motion to Dismiss.

**B. Summary Judgment**

Summary Judgment is proper if the pleadings, depositions, answers to interrogatories, and admission on file, together with any affidavits, show that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Russo v. Health, Welfare & Pension Fund, Local 705*, 984 F.2d 762 (7th Cir.1993). A thorough discussion of Rule 56 can be found in a trilogy of cases decided in 1986 by the Supreme Court of the United States.[2] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *Celotex* addressed the initial burdens of the parties under Rule 56, and Anderson addressed the standards under which the

---

1. The Federal Rules states that if, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. Fed.R.Civ.P. 12(b).

2. The Supreme Court trilogy was later reexamined in *Eastman Kodak v. Image Technical Servs.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), a case born in the context of antitrust law. The most that can be said for *Eastman Kodak*, however, is that ti did not tinker with *Celotex* and *Anderson*, and possibly involves an attempt to clarify *Matsushita*. This view is well-supported by an in-depth academic analysis in Schwarzer, Hirsch, and Marrans, *The Analysis and decision of Summary Judgment Motions*, 139 F.R.D. 441 (1992).

record is to be analyzed within the structure of Rule 56.

The initial burden is on the moving party to demonstrate, "with or without supporting affidavits," the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56). A question of material fact is a question which will be outcome determinative of an issue in the case. The Supreme Court has instructed that the facts material in a specific case shall be determined by the substantive law controlling the given case or issue. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "designate 'specific facts to show that there is a genuine [material] fact for trial.'" *Id.* The non-moving party cannot rest on its pleadings, *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920–21 (7th Cir.1994); *Hughes v. Joliet Correctional Ctr.*, 931 F.2d 425, 428 (7th Cir.1991), nor may that party rely upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir.1992).

During its summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Smith v. Fruin*, 28 F.3d 646, 650 (7th Cir.1994), *cert. denied*, 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995); *Brennan v. Daley*, 929 F.2d 346, 348 (7th Cir.1991), *reh'g denied*, 1993 WL 518446. Furthermore, it is required to analyze summary judgment motions under the standard of proof relevant to the case or issue. *Anderson*, 477 U.S. at 252–55, 106 S.Ct. 2505. Applying these standards, the Court now considers the parties' motions.

## IV. DISCUSSION

▮ In a diversity case, federal courts apply federal procedural law and state substantive law, with rules of contract interpretation falling in the substantive category. *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir.2001), *rehearing denied*, citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties included a choice-of-law provision in the Agreement which states that Indiana law will govern the construction and interpretation of the Agreement. Agreement at 8. Where the parties agree, the Court's task is made easy.

▮ Under Indiana contract law, the construction of an unambiguous contract is a question of law for the court to decide. *Allen*, 236 F.3d at 380, *citing Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1311 (Ind.Ct.App.1991). If the meaning of the contract is ambiguous or uncertain, then the court is allowed to entertain extrinsic evidence to determine its meaning, and its construction is an issue of fact. *Id.* If, however, the ambiguity arises because of the language used in the contract and not because of extrinsic facts, then its construction is still a question of law for the court to decide. *Id., citing Bicknell*, 570 N.E.2d at 1311; *referencing also First Federal Savings Bank v. Key Markets, Inc.*, 559 N.E.2d 600, 603 (Ind.1990).

▮ In this case, the parties disagree over the language of the contract, and specifically the meaning of the term, "License Agreement." Both parties have pointed to numerous passages in the Agreement which allegedly support their relative positions, and have asked the Court to determine which interpretation is correct. Where, as here, there is no dispute as to the facts, extrinsic evidence is unnecessary because any ambiguity is the result of the language used in the contract,

and resolution is properly a matter of law for the court. *Allen*, 236 F.3d at 381.

■■ Therefore, the Court begins by attempting to give effect to the intentions of the parties as expressed in the four corners of the instrument. *Id., referencing Fetz v. Phillips*, 591 N.E.2d 644, 647 (Ind.App.1992). The Court must determine intent at the time the agreement was made by examining the language they used to express their rights and duties under the contract. *Id., referencing I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg Co.*, 695 N.E.2d 1030, 1034 (Ind.App. 1998). Indiana law also requires that contracts be read as a whole to harmonize all provisions. *Id., referencing Peoples Bank & Trust Co. v. Price*, 714 N.E.2d 712, 717 (Ind.App.1999). The court must "make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless." *Id. quoting Whitley County Teachers Ass'n v. Bauer*, 718 N.E.2d 1181 (Ind. Ct.App.1999). Applying these principals of contract interpretation to this case, the Court now turns to the Plaintiff's five counts and the Defendants' Motion to Dismiss.

### A. Count One

In Count One, the Plaintiff alleges that AM General breached the Representation Agreement when it refused to pay Beanstalk any portion of the proceeds of the sale of the HUMMER trademark to GM. Pl.'s Mem. in Supp. at 9. The Plaintiff asserts that the sale of the HUMMER title fits within the language of the contract for a "License Agreement," therefore it is entitled to its thirty-five percent commission. Id. The instrument defines "License Agreement" to include "any agreement or arrangement, whether in the form of a license or otherwise, granting merchandising or other rights in the Property." The Plaintiff asserts that this language is broad enough to cover the sale of the title to GM, making the agreement between AM General and GM a License Agreement, even though structured as a sale.

The Plaintiff derives additional support for its position from the fact that the Defendants originally attempted to amend the Representation Agreement to exclude from its definition of License Agreements any agreements entered into with another entity for the purpose of co-manufacturing motor vehicles, even if rights in the Property are involved in the agreement. The Defendants, on the other hand, assert that the language of the Agreement making Beanstalk the "sole and exclusive non-employee representative through the Territory for all fields of use" only limits AM General's ability to merchandise the HUMMER title through other non-employee merchandisers. Pl.'s Mem. in Supp. at 5. Am General asserts that it retained the right to merchandise the title through its own employees.

The Defendant points to other language in the Agreement discussing the rights it retained in the Property to support the claim that the exclusive right it granted to Beanstalk applied only to non-employees. The Defendant points out, for example, that Section 14(c) allows the Owner, AM General, to discontinue marketing of "any of the titles constituting the Property" by giving Beanstalk ninety days prior written notice. In addition, Sections 3, 4, and 5 limit Beanstalk to compensation for work performed by Beanstalk under the Agreement. The Defendant asserts that these provisions taken together establish that Beanstalk is not entitled to compensation for Agreements solicited, negotiated and executed entirely by AM General. Def.s' Mem. in Supp. at 6.

The Defendant's primary argument, however, is that it sold the HUMMER

trademark to GM, and that a sale is not a License Agreement subject to the contract. Id. at 3. This last argument will be addressed first because if the sale is not a License Agreement covered by the Agreement, and if the sale does not violate the Agreement, then Beanstalk has no claim against the Defendants for compensation.

■ First, AM General considered licensing the HUMMER trademark to GM, but apparently chose an outright sale because it was unwilling to pay Beanstalk a commission on the transaction. Transfer of the HUMMER title was essential to the success of the AM General/GM agreement. The Court must determine if Beanstalk successfully protected itself from the possibility that AM General might decide to sell the Property by including appropriate language in the Agreement. Beanstalk drafted the contract, so it will strictly construed, and any ambiguities that can't be resolved by other means will be construed against Beanstalk. *See, Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1132 (Ind.1995).

■ The Agreement does not specifically address the issue of sale of a title, but it does include a provision for withdrawal of a title from the Agreement, with a ninety day written notice. Agreement at 6. The Agreement does not define "title", but a court interpreting a written contract should give words their ordinary meaning absent ambiguity. *Bernstein v. Glavin*, 725 N.E.2d 455, 459 (Ind.Ct.App.2000) (citations omitted). Webster's dictionary defines "title" as "[a]n identifying name given to a book, play, film, musical composition, or work of art." Webster's II New Riverside Dictionary (1994). Black's Law Dictionary defines "title" as "[t]he union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property." Black's Law Dictionary (7th Ed.1999). Simply put, a title is a name, as in the HUMMER name.

■ Therefore, it appears to have been contemplated by the parties that AM General could withdraw a "title", including the HUMMER name, even though it is the only name listed under the definition of "Property" that is the subject of the contract. AM General has pointed out that it has other titles that the Plaintiff can still market, for example the HUMVEE title, but that showing is not necessary for the Court to conclude that AM General reserved the right to withdraw the HUMMER title from the Agreement with ninety days written notice. Otherwise, this provision of the contract would be meaningless. However, neither party has informed the Court whether AM General gave the Plaintiff written notice of its intention to withdraw the title. Even if not, the Court finds other evidence in the Agreement that AM General reserved the right to terminate the Agreement.

Paragraph 6 of the Agreement specifically addresses the issue of termination. Paragraph 6(a) states that the term of the Agreement was from February 1, 1997 through December 31, 2000, "unless otherwise terminated pursuant to the provisions hereof." Similarly, 6(b) contains a provision for automatic renewal of the contract if the Agreement "has not been terminated prior to the expiration of the first period." The Agreement also states that upon expiration or "in the event the Agreement is terminated *for any reason whatsoever*, neither party shall have any obligations to the other except as set forth in Paragraphs 4(a), 5, and 8 hereof." Agreement ¶ 7 (emphasis added).

■ The Plaintiff asserts that AM General could not terminate the contract as long as Beanstalk was meeting its obligations under the Agreement. However, the Agreement does not support this position, but rather includes language indicating that the parties' intent was to allow

termination of the Agreement. If Beanstalk had wanted AM General locked in for the full five years with no right to terminate the Agreement unless Beanstalk failed to perform, Beanstalk, as the drafter of the contract, should have included clear language to that effect. Instead, the Agreement gives AM General rights clearly contrary to the Plaintiff's contentions. For example, AM General reserved the right to withdraw titles, including the HUMMER title, and AM General reserved the absolute right to veto, without cause and at its sole discretion, any proposed or negotiated License Agreement. Agreement ¶ 12. The Plaintiff has also attempted to shoehorn AM General's sale of the HUMMER trademark into the definition of a License Agreement, but it doesn't fit. The law distinguishes between a sale and a license, for example, in the area of tax law, where a sale is taxed differently from a license agreement. *See, Consolidated Foods Corporation v. United States,* 569 F.2d 436 (7th Cir.1978); *Tomerlin Trust v. C.I.R.,* 87 T.C. 876, 1986 WL 22043 (U.S.Tax Ct.1986) *citing Consolidated.*

In *Tomerlin Trust,* the Tax Court noted that the issue of whether a transfer of the use of a trademark is a sale or a license for tax purposes is a thorny one that has not always been resolved consistently in the courts. *Tomerlin Trust,* 87 T.C. at 888. However, the central issue is whether the transferor retained any proprietary rights in the transferred trademark. In this case, AM General calls the transaction a sale, and the Plaintiff has not alleged that AM General retained any proprietary rights in the HUMMER trademark. The same transaction cannot be both a sale and a license agreement. Even if the sale fits technically within the language of the Agreement, the Plaintiff has not alleged facts sufficient to support its contention that the sale is a license agreement, so this argument fails. The Court finds as a matter of law that the transfer was a sale.

Based on the language of the contract, the effect of the sale is to remove the HUMMER title from the Agreement. The contract states that AM General grants to the Plaintiff the right to merchandise the HUMMER trademark "to the fullest extent that Owner has, or may hereafter obtain, title or right thereto." Agreement ¶ 1(a). After the sale, AM General no longer had title or any rights in the property to grant. Therefore, the sale of the HUMMER trademark to GM effectively canceled the Agreement as to that title.

For these reasons, the Court finds, as a matter of law, that the Plaintiff has no basis for a claim against the Defendant AM General for payment of a commission on the sale of the HUMMER title to GM. The Defendants' Motion to Dismiss on Count One is therefore **GRANTED** and Plaintiff's Cross Motion for Summary Judgment is **DENIED**.

## B. Count Two

In Count Two, the Plaintiff alleges that AM General breached the Representation Agreement by denying Beanstalk its right of compensation under the terms of the Agreement for any renewals, extensions or modifications of existing License Agreements made after December 31, 1999. This issue was specifically addressed by the parties in the Agreement in Paragraph 4 under compensation. The Agreement states that Beanstalk's compensation shall be thirty-five percent of gross receipts "actually received on Owner's behalf (i) under any License Agreements entered into and executed and/or substantially negotiated prior to the date of termination or expiration of this Agreement"; and "(ii) under any initial term, renewals, extensions or modifications of any such License Agreements during the term of this Agreement, and renewal or extension thereof, *whether*

*prior to or after termination or expiration hereof."* (emphasis added). Agreement at 3. In addition, the Agreement states, "Beanstalk's share of advances, guarantees, royalties, or other compensation under the License Agreement once fully executed, cannot be waived, modified or amended by Owner without Beanstalk's prior written consent." Id.

Beanstalk claims that after AM General entered into the GM Agreement, AM General informed Beanstalk that it no longer owned the property and therefore could no longer authorize Beanstalk to act as its licensing agent for the Property under the Representation Agreement. Compl. at ¶ 19. GM then informed Beanstalk that it had no obligation to Beanstalk under the Agreement and did not intend to assume any of AM General's obligations. Id. at ¶ 21. Beanstalk claims that GM offered to allow Beanstalk to retain its share of revenues paid under the current term of License Agreements in place as of December 31, 1999, but that Beanstalk would receive no compensation for new License Agreements entered into after December 31, 1999, or for any renewals, extensions or modifications of any License Agreements obtained under the Representation Agreement. Id.

▉▉▉▉ The plain language of the Agreement negotiated by the parties states that the Owner cannot deny Beanstalk compensation for License Agreements that are fully executed or substantially negotiated before the termination or expiration of the Agreement. In addition, the Agreement states that Beanstalk is entitled to compensation for any renewal or extension of License Agreements it negotiated and executed, whether prior to or after termination or expiration of the Agreement. Finally, the Agreement states that compensation due under any fully executed License Agreement cannot be unilaterally waived, modified or amended by the Own-

er without Beanstalk's prior written consent. Beanstalk has not consented to any waiver, modification or amendment of its compensation for License Agreements negotiated and executed pursuant to the contract. Therefore, Beanstalk must be compensated according to the terms of the contract for any fully executed License Agreements and for any renewals or extensions of those Licenses Agreements. If AM General fails to compensate Beanstalk pursuant to the Agreement for License Agreements fully executed prior to termination of the Agreement on December 31, 1999, and for any renewals, extensions or modifications of those License Agreements, it has breached the Agreement.

This determination, however, does not end the Court's inquiry because Beanstalk has not put evidence before the Court to show that the Defendants have actually denied payment due on a License Agreement, renewal, extension or modification. According to the terms of the Agreement, AM General retained the "absolute right to veto, without cause and at its sole discretion, any program, person, firm, corporation or proposed or negotiated license or License Agreement." Agreement at ¶ 12. Therefore, AM General is under no obligation to renew, extend or modify any existing License Agreement. If the Defendants do not renew, extend or modify any License Agreement negotiated and executed by Beanstalk on behalf of AM General, then no compensation is owed and the Agreement is not breached. However, if either AM General or Beanstalk has renewed, extended or modified an existing agreement negotiated and executed by Beanstalk without paying Beanstalk the compensation required by the Agreement, or does so in the future, then the Defendants are in breach and Beanstalk may recover.

The Plaintiff believes that it can recover from the Defendants under a theory of anticipatory repudiation because GM allegedly informed the Plaintiff that it would not pay commissions on renewals, extensions or modifications, even though required to do so by the Agreement. Courts can award damages under a theory of anticipatory repudiation where the parties obligations under the contract are clear, and one party asserts that it does not intend to perform. *See, Jay County Rural Electric Membership Corp. v. Wabash Valley Power Assoc., Inc.,* 692 N.E.2d 905 (Ind.Ct.App.1998) (stating that repudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach). In this case, the Defendant, AM General retained an absolute right to veto any License Agreements, a right which extends to renewals, extensions and modifications. In addition, AM General has the right to remove titles from the Agreement, and to terminate the Agreement. In light of these provisions, the Court finds that the Defendants cannot as a matter of law commit an anticipatory breach under the Agreement. The Plaintiff must point to an actual breach with specific damages before the Court can enforce the Agreement against the Defendants.

For the foregoing reasons, the Defendants Motion to Dismiss is hereby **GRANTED,** and the Plaintiff's Cross Motion for Summary Judgment is **DENIED.** However, if the Plaintiff can provide the Court with evidence of an actual breach of the terms and conditions of the Agreement the Plaintiff has thirty (30) days to reinstate the claim and renew its motion for summary judgment

## C. Count Three

The Defendants allege, and the Plaintiff apparently concedes, that Count Three for breach of the implied covenant of good faith and fair dealing is not recognized as a separate cause of action in Indiana. Def.s' Mem. in Supp. at 9; Pl.'s Mem. in Opp. at 7 (stating that Beanstalk hereby voluntarily dismisses as a separate claim its claim for breach of the implied covenant of good faith and fair dealing (Count Three)). Plaintiff's Count Three is therefore **DISMISSED.**

## D. Count Four

In Count Four, the Plaintiff claims that it is entitled to recovery because it has rendered substantial and valuable services to AM General for which AM General and GM refuse to pay. Compl at ¶ 34. The Plaintiff states that the Property is now producing significant revenues for the Defendants, existing licenses will be renewed and expanded for their benefit, and new licenses will be entered into for their benefit, all of which will unjustly enrich the Defendants at the expense of Beanstalk. This claim is virtually inseparable from the Plaintiff's Counts One and Two, except it is based on a quasi-contract or constructive contract theory instead of on the actual Agreement.

Indiana courts allow recovery on a theory of constructive contract in situations where no contract actually exists, but "where justice nevertheless warrants a recovery under the circumstances as though there had been a promise." *See, Ahuja v. Lynco Ltd. Medical Research,* 675 N.E.2d 704, 708 n. 2 (Ind.App.1996) (citations omitted). The court in *Ahuja* noted that issues of unjust enrichment and conferring a benefit arise in the context of a constructive contract. *Id.* In this case, the parties had an actual contract, thus precluding the possibility of recovery under a constructive contract theory.

The Court has determined, based on the evidence presented, that AM General has not breached the Agreement. The Plaintiff cannot make an end run around the

Agreement and attempt to recover under a theory of unjust enrichment. The parties negotiated the agreement setting out their obligations under the contract. The Agreement contains a provision stating that it represents the entire understanding of the parties. The Court lacks authority to create additional obligations based on a constructive contract theory.

Defendant GM, however, was not in a contractual relationship with the Plaintiff. The Plaintiff's claim against GM still fails for the same reasons as set forth in the paragraph B above discussing Count Two. Unless AM General can provide the Court with evidence that GM has renewed or extended licenses without paying Beanstalk the commission agreed to in the contract, GM has not been unjustly enriched. Therefore, the Defendants' Motion to Dismiss Count Four is hereby **GRANTED.**

**E. Count Five**

 In Count Five, the Plaintiff alleges that GM's conduct rises to the level of Tortious Interference with Contractual Relations. This state law tort requires the Plaintiff to establish five elements: (1) existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of a breach of contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach. *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1235 (Ind.1994) (citations omitted). In this case, the Court has already determined that the Defendants have not breached the Agreement, therefore the Plaintiff has no basis for a claim for tortious interference with a contractual relationship. The Defendants' Motion to Dismiss Count Five is therefore **GRANTED.**

## V. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss is **GRANTED** on all five of the Plaintiff's claims. The Plaintiff's Counter Motion for Summary Judgment on Claims One and Two is hereby **DENIED.** However, if the Plaintiff can produce evidence that the Defendants have renewed, extended or modified a License Agreement that was negotiated and fully executed by the Plaintiff without paying Beanstalk's compensation pursuant to the terms of the Agreement, the Plaintiff has thirty (30) days to reinstate Claims Two, Four and Five and to renew its motions.

**IT IS SO ORDERED.**